## PETTIBONE *v.* NICHOLS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF IDAHO.

No. 249.   Argued October 10, 11, 1906.—Decided December 3, 1906.

The duty of a Federal court, to interfere, on *habeas corpus*, for the protection of one alleged to be restrained of his liberty in violation of the Constitution or laws of the United States must often be controlled by the special circumstances of the case, and except in an emergency demanding prompt action, the party held in custody by a State, charged with crime against its laws, will be left to stand his trial in the state court, which, it will be assumed, will enforce, as it has the power to do equally with a Federal court, any right asserted under and secured by the supreme law of the land.

Even if the arrest and deportation of one alleged to be a fugitive from justice may have been effected by fraud and connivance arranged between the executive authorities of the demanding and surrendering States so as to deprive him of any opportunity to apply before deportation to a court in the surrendering State for his discharge, and even if on such application to any court, state or Federal, he would have been discharged, he cannot, so far as the Constitution or the laws of the United States are concerned—when actually in the demanding State, in the custody of its authorities for trial, and subject to the jurisdiction thereof —be discharged on *habeas corpus* by the Federal court.   It would be

improper and inappropriate in the Circuit Court to inquire as to the motives guiding or controlling the action of the Governors of the demanding and surrendering States.

No obligation is imposed by the Constitution or laws of the United States on the agent of a demanding State to so time the arrest of one alleged to be a fugitive from justice and so conduct his deportation from the surrendering State as to afford him a convenient opportunity, before some judicial tribunal, sitting in the latter State, upon *habeas corpus* or otherwise, to test the question whether he was a fugitive from justice and as such liable. under the act of Congress, to be conveyed to the demanding State for trial there.

THIS is an appeal from a judgment of the Circuit Court of the United States for the District of Idaho refusing, upon *habeas corpus,* to discharge appellant who alleged that he was held in custody by the Sheriff of Canyon County, in that State, in violation of the Constitution and laws of the United States.

It appears that on the twelfth day of February, 1906 a criminal complaint verified by the oath of the Prosecuting Attorney of that county, and charging Pettibone with having murdered Frank Steunenberg at Caldwell, Idaho, on the thirtieth day of December, 1905, was filed in the office of the Probate Judge. Thereupon, a warrant of arrest based upon that complaint having been issued application was made to the Governor of Idaho for a requisition upon the Governor of Colorado (in which State the accused was alleged then to be) for the arrest of Pettibone and his delivery to the agent of Idaho, to be conveyed to the latter State and there dealt with in accordance with law. The papers on which the Governor of Idaho based his requisition distinctly charged that Pettibone was in that State at the time Steunenberg was murdered and was a fugitive from its justice.

A requisition by the Governor of Idaho was accordingly issued and was duly honored by the Governor of Colorado, who issued a warrant commanding the arrest of Pettibone and his delivery to the authorized agent of Idaho, to be conveyed to the latter State. Pettibone was arrested under that warrant and carried to Idaho by its agent, and was there delivered by order of the Probate Judge into the custody of the Warden

of the state penitentiary, the jail of the county being deemed at that time an unfit place.

On the twenty-third day of February, 1906, Pettibone sued out a writ of *habeas corpus* from the Supreme court of Idaho. The Warden made a return, stating the circumstances under which the accused came into his custody, and also that the charge against Pettibone was then under investigation by the grand jury. To this return the accused made an answer embodying the same matters as were alleged in the application for the writ of *habeas corpus*, and charging, in substance, that his presence in Idaho had been procured by connivance, conspiracy, and fraud on the part of the executive officers of Idaho, and that his detention was in violation of the provisions of the Constitution of the United States and of the act of Congress relating to fugitives from justice.

Subsequently, March 7, 1906, the grand jury returned an indictment against Pettibone, William D. Haywood, Charles H. Moyer, and John L. Simpkins, charging them with the murder of Steunenberg on the thirtieth of December, 1905, at Caldwell, Idaho. Having been arrested and being in custody under that indictment, the officer holding Pettibone made an amended return stating the fact of the above indictment and that he was then held under a bench warrant based thereon.

At the hearing before the Supreme Court of the State the officers having Pettibone in custody moved to strike from the answer of the accused all allegations relating to the manner and method of obtaining his presence within the State. That motion was sustained March 12, 1906, and the prisoner was remanded to await his trial under the above indictment. The Supreme Court of Idaho held the action of the Governor of Colorado to be at least *quasi* judicial and, in effect, a determination that Pettibone was charged with the commission of a crime in the latter State and was a fugitive from its justice; that after the prisoner came within the jurisdiction of the demanding State he could not raise in its courts the question whether he was or had been as a matter of fact a fugitive from

the justice of that State; that the courts of Idaho had no jurisdiction to inquire into the acts or motives of the executive of the State delivering the prisoner; that "one who commits a crime against the laws of a State, whether committed by him while in person on its soil or *absent in a foreign jurisdiction and acting through some other agency or medium,* has no vested right of asylum in a sister State," and the fact "that a wrong is committed against him in the manner or method pursued in subjecting his person to the jurisdiction of the complaining State, and that such wrong is redressible either in the civil or criminal courts, can constitute no legal or just reason why he himself should not answer the charge against him when brought before the proper tribunal." *Ex parte Pettibone,* 85 Pac. Rep. 902; *Ex parte Moyer,* 85 Pac. Rep. 897.

From the judgment of the Supreme Court of Idaho a writ of error was prosecuted to this court. That case is No. 265 on the docket of the present term, but the record has not been printed. But the parties agree that the same questions are presented on this appeal as arise in that case, and as this case is one of urgency in the affairs of a State, we have acceded to the request that they may be argued and determined on this appeal.

On the fifteenth of March, 1906, after the final judgment in the Supreme Court of Idaho, Pettibone made application to the Circuit Court of the United States, sitting in Idaho, for a writ of *habeas corpus,* alleging that he was restrained of his liberty by the Sheriff of Canyon County in violation of the Constitution and laws of the United States. As was done in the Supreme Court of Idaho, the accused set out numerous facts and circumstances which, he contended, showed that his personal presence in Idaho was secured by fraud and connivance on the part of the executive officers and agents of both Idaho and Colorado, in violation of the constitutional and statutory provisions relating to fugitives from justice. Consequently, it was argued, the court in Idaho did not acquire jurisdiction over his person. The officer having Pettibone in

custody made return to the writ that he then held the accused under the bench warrant issued against him. It was stipulated that the application for the writ of *habeas corpus* might be taken as his answer to the return. Subsequently, on motion, that answer was stricken out by the Circuit Court as immaterial, the writ of *habeas corpus* was quashed, and Pettibone was remanded to the custody of the State.

*Mr. Edmund F. Richardson* and *Mr. Clarence S. Darrow*, with whom *Mr. John H. Murphy* was on the brief for appellant:

These cases are *sui generis*. The facts show that the Governor of the State, upon whom the demand was made, had full knowledge of the falsity of the proceedings, and with such knowledge of that falsity, actually engaged in a conspiracy to remove citizens of his own State to another State, and actually furnished the military forces of his State to aid in the accomplishment of that purpose. This is not a case of actual fugitives from justice. If one has committed a crime within a State, and has fled therefrom, the law is not particular as to the means or the method by which his return to that State is insured. The law, however, will never wink at a fraud foisted upon itself, and especially is that true where that fraud is practiced by a sworn prosecuting officer and the chief executive of a State. No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. *United States* v. *Lee*, 106 U. S. 196, 220; *Burton* v. *United States*, 202 U. S. 344.

Jurisdiction of the subject matter in a court is one thing; jurisdiction of a person in any wise related to that subject matter is quite another. *Pennoyer* v. *Neff*, 95 U. S. 714, 724.

The jurisdiction of the persons of the defendants was acquired by the District Court of Canyon County, through the wrongs and the frauds of the prosecuting officer of that county, aided and abetted by the Governors of the States of Idaho and Colorado, through a conspiracy formed for that purpose. 2 Bishop on Crim. Law, 171.

Constitutional guaranties have been violated by the arrest of appellants. The Fourth Amendment provides that the right of the people to be secure in their persons against unreasonable seizures shall not be violated. *Ex parte Sawyer*, 124 U. S. 200.

No provision exists for extraditing one charged to have constructively committed an offense in a State in which he was not present. The Constitution and the law guards even an offender in such a case as that against extradition. *State* v. *Hall*, 115 N. C. 811.

It would be without due process of law. For definitions of due process of law see 3 Words and Phrases, 2227; *Davidson* v. *New Orleans*, 96 U. S. 97, 104; *Missouri Pacific Ry. Co.* v. *Humes*, 115 U. S. 512, 519; *Holden* v. *Hardy*, 169 U. S. 366; *State* v. *Ashbrook*, 154 Missouri, 375.

As protecting against arbitrary executive or judicial action see *People* v. *Adirondack Ry. Co.*, 160 N. Y. 225, 238; *State* v. *Hammer*, 116 Iowa, 284, 288; *Jenkins* v. *Ballantyne*, 8 Utah, 245.

The arrest and detention of these prisoners is in direct violation of cl. 2, § 2, Art. 4, of the Constitution, and § 5278, Rev. Stats. They were not fugitives from justice, never having been in Idaho. *Kentucky* v. *Dennison*, 24 How. 66, 110; *People* v. *Hyatt*, 172 N. Y. 176, reversed in *Hyatt* v. *Corkran*, 188 U. S. 691, 713; *Munsey* v. *Clough*, 196 U. S. 364; *Tennessee* v. *Jackson*, 36 Fed. Rep. 258; *Re Cook*, 49 Fed. Rep. 833; *S. C.*, 146 U. S. 183; *Ker* v. *Illinois*, 119 U. S. 436; *Mahon* v. *Justice*, 127 U. S. 700; *Re Moore*, 75 Fed. Rep. 821.

The foundation of jurisdiction of the court of Idaho over the persons of appellants is based upon a false affidavit by the District Attorney of Canyon County, and no lawful thing, founded upon a wrongful act, can be supported. *Ilsley* v. *Nichols*, 12 Pick. (Mass.) 270; *Luttin* v. *Benin*, 11 Mod. 50; *Smith* v. *Meyer*, 1 T. & C. (N. Y.) 665; *Re Largrave*, 45 How. Prac. 301; 2 Wharton, Conflict of Laws, § 849; *Re Allen*, 13 Blatchf. 271; *Hooper* v. *Lane*, 6 H. L. Cas. 443; *Hill* v. *Good-*

*rich,* 32 Connecticut, 588; *Re Robinson,* 8 L. R. A. (Neb.) 398; *Re Walker,* 61 Nebraska, 803; *Compton* v. *Wilder,* 40 Ohio St. 130; *Adriance* v. *Largrave,* 59 N. Y. 110; *Browning* v. *Abrahams,* 51 How. Prac. 173; *Kendall* v. *Ailshire,* 28 Nebraska, 707; *Lascelles* v. *Georgia,* 148 U. S. 537; *Adams* v. *People,* 1 N. Y. 173; *Ex parte Reggel,* 114 U. S. 642.

The Fourteenth Amendment forbids any arbitrary deprivation of liberty. *Re Converse,* 137 U. S. 624; *Hodgson* v. *Vermont,* 168 U. S. 262. And it is the duty of the Federal court to exercise its jurisdiction to protect appellant.

Federal courts have sometimes required the prisoner to await the action of the state courts upon the theory that the state courts were as likely to administer the law as were the courts of the United States, and they have sometimes withheld relief on writs of *habeas corpus,* and required defendants, who were convicted, to sue out writs of error, but they have never denied the authority of the Federal courts in the premises. *Robb* v. *Connolly,* 111 U. S. 624; *Roberts* v. *Riley,* 116 U. S. 80; *Bruce* v. *Runyan,* 124 Fed. Rep. 481; *Ex parte Hart,* 63 Fed. Rep. 249; *Re Roberts,* 24 Fed. Rep. 132; *Ex parte Brown,* 28 Fed. Rep. 653; *Ex parte Morgan,* 20 Fed. Rep. 298; *Ex parte Robb,* 19 Fed. Rep. 26; *Re Doo Woon,* 18 Fed. Rep. 898; *Ex parte McKean,* 16 Fed. Cas. No. 8848.

If this court will not act, appellant is without relief, and the circumstances warrant its intervention. *Allen* v. *Georgia,* 166 U. S. 138. Everything has been done before invoking the aid of this court which is required. *Whitten* v. *Tomlinson,* 160 U. S. 231.

While *habeas corpus* cannot usurp the functions of a writ of error, it is preëminently the writ on which to test jurisdiction, not error within jurisdiction. A fatal defect in jurisdiction itself is the question presented by this record. *Fells* v. *Murphy,* 201 U. S. 223; *Valentina* v. *Mercer,* 201 U. S. 131; *Whitney* v. *Dick,* 202 U. S. 232; *Wood* v. *Brush,* 140 U. S. 278; but whatever the usual rule may be, special circumstances authorize a departure from it. *Re Lincoln,* 202 U. S. 178.

Mr. James H. Hawley, with whom Mr. W. E. Borah was on the brief, for appellees:

There was no conspiracy and the proceedings were regular. Appellants were accessories to the crime, and can be tried as such. Sec. 7697 et seq. Rev. Stat. Idaho; Territory v. Guthrie, 2 Idaho, 432.

Even if, as is denied, the procedure was unlawful there is no right of asylum in a sister State by one who commits a crime against the laws of a State either while personally on its soil or while in a foreign jurisdiction and acting through some other agency or medium. Mahon v. Justice, 127 U. S. 715; Lascelles v. Georgia, 148 U. S. 543; Ker v. Illinois, 119 U. S. 436; Re Moore, 75 Fed. Rep. 824; Re Cook, 49 Fed. Rep. 833; Cook v. Hart, 146 U. S. 183.

How the accused person has come within the State wherein the crime was committed cannot be inquired into by the courts of such State. It is not a cause of exemption from prosecution for a crime that the accused was illegally arrested or unlawfully brought within the jurisdiction. 13 Cyc. Law & Pro. 99; 12 Ency. of Law, 607; Church on Hab. Cor., 461; Ex parte Baker, 13 Am. St. Rep. 17; State v. Smith, 19 Am. Dec. 679; State v. Ross, 21 Iowa, 467; Dow's Case, 18 Pa. St. 37.

There is no limitation or restriction upon the crime for which a man may be extradited in interstate extradition; that duty is equally imperative as to all crimes, and no right of return is provided for or necessarily implied. 2 Moore, Extradition, § 643; Re Noyes, 17 Alb. L. J. 407; Ham v. State, 4 Texas App. 645; Harland v. Washington, 3 Wash. Terr. 153; State v. Stewart, 60 Wisconsin, 587; Ex parte Barker, 87 Alabama, 4; William v. Weber, 1 Colo. App. 191; State v. Brewster, 7 Vermont, 120; Adriance v. Lagrave, 59 N. Y. 110; United States v. Caldwell, 8 Blatchf. 133; United States v. Lawrence, 13 Blatchf. 299, 307; People v. Rowe, 4 Park. Crim. Rep. 253; Re Miles, 52 Vermont, 609; Mahon v. Justice, 127 U. S. 700.

The court will not inquire into the legality of arrest. That the accused is in court is sufficient to require him to answer

the indictment against him.  12 Am. & Eng. Ency. of Law, 598; *Ex parte Scott,* 9 B. & C. 446; *State* v. *Kealy,* 89 Iowa, 94; *State* v. *Patterson,* 110 Missouri, 505; *State* v. *Smith,* 1 Bailey L. (S. Car.) 283.

There is no difference between cases of kidnaping by unauthorized persons and cases wherein the extradition is conducted under the forms of law but through mistake or intentionally the Governor of either the demanding or surrendering State has failed in his duty.  The Governor upon whom the demand is made must determine for himself, in the first instance, whether the demanded person is a fugitive from justice.  *Ex parte Reggel,* 114 U. S. 642; *Roberts* v. *Reilley,* 116 U. S. 80; *People* v. *Pratt,* 78 California, 349; *Hyatt* v. *Corkran,* 188 U. S. 691, distinguished.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

As the application for the writ of *habeas corpus* was, by stipulation of the parties taken as the answer of the accused to the return of the officer holding him in custody, and as that answer was stricken out by the court below as immaterial, we must, on this appeal, regard as true all the facts sufficiently alleged in the application which, in a legal sense, bear upon the question whether the detention of the accused by the state authorities was in violation of the Constitution or laws of the United States.

That application is too lengthy to be incorporated at large in this opinion.  It is sufficient to say that its allegations present the case of a conspiracy between the Governors of Idaho and Colorado, and the respective officers and agents of those States, to have the accused taken from Colorado to Idaho under such circumstances and in such way as would deprive him, while in Colorado, of the privilege of invoking the jurisdiction of the courts there for his protection against wrongful deportation from the State—it being alleged that the Governor

of Idaho, the Prosecuting Attorney of Canyon County, and the private counsel who advised them well knew all the time that "he was not in the State of Idaho on the thirtieth day of December, 1905, nor at any time near that date." The application also alleged that the accused "is not and was not a fugitive from justice; that he was not present in the State of Idaho when the alleged crime was alleged to have been committed, nor for months prior thereto, nor thereafter, until brought into the State as aforesaid."

In the forefront of this case is the fact that the appellant is held in actual custody for trial under an indictment in one of the courts of Idaho for the crime of murder charged to have been committed in that State against its laws, and it is the purpose of the State to try the question of his guilt or innocence of that charge.

Undoubtedly, the Circuit Court had jurisdiction to discharge the appellant from the custody of the state authorities if their exercise of jurisdiction over his person would be in violation of any rights secured to him by the Constitution or laws of the United States. But that court had a discretion as to the time and mode in which, by the exercise of such power, it would by its process obstruct or delay a criminal prosecution in the state court. The duty of a Federal court to interfere, on *habeas corpus,* for the protection of one alleged to be restrained of his liberty in violation of the Constitution or laws of the United States, must often be controlled by the special circumstances of the case, and unless in some emergency demanding prompt action the party held in custody by a State and seeking to be enlarged will be left to stand his trial in the state court, which, it will be assumed, will enforce—as it has the power to do equally with a court of the United States; *Robb* v. *Connolly,* 111 U. S. 624, 637—any right secured by the Supreme law of the land. "When the state court," this court has said, "shall have finally acted upon the case, the Circuit Court has still a discretion whether, under all the circumstances then existing, the accused, if convicted, shall be

put to his writ of error from the highest court of the State, or whether it will proceed, by writ of *habeas corpus*, summarily to determine whether the petitioner is restrained of his liberty in violation of the Constitution of the United States." *Ex parte Royall*, 117 U. S. 241, 251, 253. To the same effect are numerous cases in this court, among which may be named *Ex parte Fonda*, 117 U. S. 516; *New York v. Eno*, 155 U. S. 89, 93; *Cook v. Hart*, 146 U. S. 183, 192; *Minnesota v. Brundage*, 180 U. S. 499, 501; *Reid v. Jones*, 187 U. S. 153; *Riggins v. United States*, 199 U. S. 547, 549. This rule firmly established for the guidance of the courts of the United States is applicable here, although it appears that the Supreme Court of Idaho has already decided some of the questions now raised. But the question of Pettibone's guilt of the crime of having murdered Steunenberg has not, however, been finally determined and cannot be except by a trial under the laws and in the courts of Idaho. If he should be acquitted by the jury, then no question will remain as to a violation of the Constitution and laws of the United States by the methods adopted to secure his personal presence within the State of Idaho.

The appellant, however, contends that the principle settled in *Ex parte Royall* and other like cases can have application only where the State has legally acquired jurisdiction over the person of the accused, and cannot apply when, as is alleged to be the case here, his presence in Idaho was obtained by fraud and by a violation of rights guaranteed by the Constitution and laws of the United States. Under such circumstances, it is contended, no jurisdiction could legally attach for the purpose of trying the accused under the indictment for murder.

In support of this view we have been referred to that clause of the Constitution of the United States providing that if "a person charged in any State with treason, felony, or other crime, who shall flee from justice and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the crime." Art. 4, § 2;

also, to sec. 5278 of the Revised Statutes, in which it is provided that "whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the Governor or Chief Magistrate of the State or Territory from whence the person so charged has fled, it shall be the duty of the executive authority of the State or Territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the State or Territory making such demand shall be paid by such State or Territory."

Looking, first, at what was alleged to have occurred in the State of Colorado touching the arrest of the petitioner and his deportation from that State, we do not perceive that anything done there, however hastily or inconsiderately done, can be adjudged to be in violation of the Constitution or laws of the United States. We pass by, both as immaterial and inappropriate, any consideration of the motives that induced the action of the Governor of Colorado. This court will not inquire as to the motives which guided the Chief Magistrate of a State when executing the functions of his office. Manifestly, whatever authority may have been conferred upon the Governor of Colorado by the constitution or laws of his State, he was not required, indeed, was not authorized by the Constitution or laws of the United States to have the petitioner arrested, unless within the meaning of such Consti-

tution and laws he was a fugitive from the justice of Idaho. Therefore he would not have violated his duty if it had been made a condition of surrendering the petitioner that evidence be furnished that he was a fugitive from justice within the meaning of the Constitution of the United States. Upon the Governor of Colorado rested the responsibility of determining, in some proper mode, what the fact was. But he was not obliged to demand proof of such fact by evidence apart from the requisition papers. As those papers showed that the accused was regularly charged by indictment with the crime of murder committed in Idaho and was a fugitive from its justice, the Governor of Colorado was entitled to accept such papers, coming as they did from the Governor of another State, as *prima facie* sufficient for a warrant of arrest. His failure to require independent proof of the fact that petitioner was a fugitive from justice cannot be regarded as an infringement of any right of the petitioner under the Constitution or laws of the United States. *Ex parte Reggel*, 114 U. S. 642, 652, 653. In *Munsey* v. *Clough*, 196 U. S. 364, 372, this court said that the issuing of a warrant of arrest by the Governor of the surrendering State, "with or without a recital therein that the person demanded is a fugitive from justice, must be regarded as sufficient to justify the removal, until the presumption in favor of the legality and regularity of the warrant is overthrown by contrary proof in a legal proceeding to review the action of the Governor. *Roberts* v. *Reilly*, *supra; Hyatt* v. *Cockran*, 188 U. S. 691." See also *In re Keller*, 28 Fed. Rep. 681, 686.

But the petitioner contends that his arrest and deportation from Colorado was, by fraud and connivance, so arranged and carried out as to deprive him of an opportunity to prove, before the Governor of that State, that he was not a fugitive from justice, as well as opportunity to appeal to some court in Colorado to prevent his illegal deportation from its territory. If we should assume, upon the present record, that the facts are as alleged, it is not perceived that they make a case of the

violation of the Constitution or laws of the United States. It is true, as contended by the petitioner, that if he was not a fugitive from justice, within the meaning of the Constitution, no warrant for his arrest could have been properly or legally issued by the Governor of Colorado. It is equally true that, even after the issuing of such a warrant, before his deportation from Colorado, it was competent for a court, Federal or state, sitting in that State, to inquire whether he was, in fact, a fugitive from justice, and if found not to be, to discharge him from the custody of the Idaho agent and prevent his deportation from Colorado. *Robb* v. *Connolly,* 111 U. S. 624, 639; *Ex parte Reggel, supra; Hyatt* v. *Corkran,* 188 U. S. 691, 719; *Munsey* v. *Clough,* 196 U. S. 364, 374. But it was not shown by proof before the Governor of Colorado that the petitioner, alleged in the requisition papers to be a fugitive from justice, was not one, nor was the jurisdiction of any court sitting in that State invoked to prevent his being taken out of the State and carried to Idaho. That he had no reasonable opportunity to present these facts before being taken from Colorado constitutes no legal reason why he should be discharged from the custody of the Idaho authorities. No obligation was imposed *by the Constitution or laws of the United States* upon the agent of Idaho to so time the arrest of the petitioner and so conduct his deportation from Colorado, as to afford him a convenient opportunity, before some judicial tribunal sitting in Colorado, to test the question whether he was a fugitive from justice and as such liable, under the act of Congress, to be conveyed to Idaho for trial there. In England, in the case of one arrested for the purpose of deporting him to another country, it is provided that there shall be no surrender of the accused to the demanding country until after the expiration of a specified time from the arrest, during which period the prisoner has an opportunity to institute *habeas corpus* proceedings. *Extradition Act of* 1870, 33 and 34 Vict. c. 52, § 11; 2 Butler on the Treaty-Making Power, § 436; 1 Moore on Extradition, 741, 742. There is no similar act of Congress in respect of a person

arrested in one of the States of the Union as a fugitive from the justice of another State. The speediness, therefore, with which the Idaho agent removed the accused from Colorado cannot be urged as a violation of a constitutional right and constitutes no legal reason for discharging him from the custody of the State of Idaho.

We come now to inquire whether the petitioner was entitled to his discharge upon making proof in the Circuit Court of the United States, sitting in Idaho, that he was brought into that State as a fugitive from justice when he was not, in fact, such a fugitive. Of course, it cannot be contended that the Circuit Court, sitting in Idaho, could rightfully discharge the petitioner upon proof simply that he did not commit the crime of murder charged against him. His guilt or innocence of that charge is within the exclusive jurisdiction of the Idaho state court. The constitutional and statutory provisions referred to were based upon the theory that, as between the States, the proper place for the inquiry into the question of the guilt or innocence of an alleged fugitive from justice is in the courts of the State where the offense is charged to have been committed. The question, therefore, in the court below was not whether the accused was guilty or innocent, but whether the Idaho court could properly be prevented from proceeding in the trial of that issue, upon proof being made in the Circuit Court of the United States, sitting in that State, that the petitioner was not a fugitive from justice and not liable, in virtue of the Constitution and laws of the United States, to arrest in Colorado under the warrant of its Governor and carried into Idaho. As the petitioner is within the jurisdiction of Idaho, and is held by its authorities for trial, are the particular methods by which he was brought within her limits at all material in the proceeding by *habeas corpus?*

It is contended by the State that this question was determined in its favor by the former decisions of this court. This is controverted by the petitioner, and we must, therefore, and particularly because of the unusual character of this case and

the importance of the questions involved, see what this court has heretofore adjudged.

In *Ker* v. *Illinois*, 119 U. S. 436, it appeared that at the trial in an Illinois court of a person charged with having committed a crime against the laws of that State, the accused sought by plea in abatement to defeat the jurisdiction of the court upon the ground that, in violation of law, he had been seized in Peru and forcibly brought against his will into the United States and delivered to the authorities of Illinois; all of which the accused contended was in violation not only of due process of law as guaranteed by the Fourteenth Amendment, but of the treaty between the United States and Peru negotiated in 1870 and proclaimed in 1874. One of the articles of that treaty bound the contracting countries, upon a requisition by either country, to deliver up to justice persons who, being accused or convicted of certain named crimes committed within the jurisdiction of the requiring party, should seek an asylum or should be found within the territories of the other, the fact of the commission being so established "as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed." 18 Stat. 719, 720. The plea stated, among other things, that the defendant protested against his arrest and was refused opportunity, from the time of his being seized in Peru until he was delivered to the authorities of Illinois, of communicating with any person or seeking any advice or assistance in regard to procuring his release by legal process or otherwise.

The court overruled the plea of abatement, and the trial in the state court proceeded, resulting in a verdict of guilty. The judgment was affirmed by the Supreme Court of Illinois, and this court affirmed, upon writ of error, the judgment of the latter court. It was held by the unanimous judgment of this court that, so far as any question of Federal right was involved, no error was committed by the state court; and that, notwithstanding the illegal methods pursued in bringing

the accused within the jurisdiction of Illinois, his trial in the state court did not involve a violation of the due process clause of the Constitution, nor any article in the treaty with Peru, although the case was a clear one "of kidnapping within the dominion of Peru, without any pretense of authority under the treaty or from the Government of the United States." The principle upon which the judgment rested was that, when a criminal is brought or is in fact within the jurisdiction and custody of a State, charged with a crime against its laws, the State may, *so far as the Constitution and laws of the United States are concerned,* proceed against him for that crime, and need not inquire as to the particular methods employed to bring him into the State. "The case," the court said, "does not stand, when the party is in court, and required to plead to an indictment, as it would have stood upon a writ of *habeas corpus* in California, or in any States through which he was carried in the progress of the extradition, to test the authority by which he was held." In meeting the contention that the accused, Ker, by virtue of the treaty with Peru, acquired by his residence a right of asylum, this court said: "There is no language in this treaty, or in any other treaty made by this country on the subject of extradition, of which we are aware, which says in terms that a party fleeing from the United States to escape punishment for crime becomes thereby entitled to an asylum in the country to which he has fled; indeed, the absurdity of such a proposition would at once prevent the making of a treaty of that kind. . . . It is idle, therefore, to claim that, either by express terms or by implication, there is given to a fugitive from justice in one of these countries any right to remain and reside in the other; and if the right of asylum means anything, it must mean this. The right of the government of Peru voluntarily to give a party in Ker's condition an asylum in that country, is quite a different thing from the right in him to demand and insist upon security in such an asylum. The treaty, so far as it regulates the right of asylum at all, is intended to limit this right in the case of one who is proved to

be a criminal fleeing from justice, so that, on proper demand and proceedings had therein, the government of the country of the asylum shall deliver him up to the country where the crime was committed. And to this extent, and to this alone, the treaty does regulate or impose a restriction upon the right of the government of the country of the asylum to protect the criminal from removal therefrom. . . . We think it very clear, therefore, that, in invoking the jurisdiction of this court upon the ground that the prisoner was denied a right conferred upon him by a treaty of the United States, he has failed to establish the existence of any such right."

If Ker, by virtue of the treaty with Peru, and because of his forcible and illegal abduction from that country, did not acquire an exemption from the criminal process of the courts of Illinois, whose laws he had violated, it is difficult to see how Pettibone acquired, by virtue of the Constitution and laws of the United States, an exemption from prosecution by the State of Idaho, which has custody of his person.

An instructive case on this subject is *Mahon* v. *Justice,* 127 U. S. 700. The Governor of Kentucky made a requisition upon the Governor of West Virginia for Mahon, who was charged with the crime of murder in Kentucky, and was alleged to have fled from its jurisdiction and taken refuge in West Virginia. While the two Governors were in correspondence on the subject a body of armed men, without warrant or other legal process, arrested Mahon in West Virginia, and by force and against his will conveyed him out of West Virginia, and delivered him to the jailor of Pike County, Kentucky, in the courts of which he stood indicted for murder. Thereupon the Governor of West Virginia, on behalf of that State, applied to the District Court of the United States for the Kentucky District for a writ of *habeas corpus* and his return to the jurisdiction of West Virginia. This court, after observing that the States of the Union were not absolutely sovereign and could not declare war or authorize reprisals on other States, and that their ability to prevent the forcible abduction of persons from

their territory consists solely in their power to punish all violations of their criminal laws committed within it, whether. by their own citizens or by citizens of other States, said: "If such violators have escaped from the jurisdiction of the State invaded, their surrender can be secured upon proper demand on the executive of the State to which they have fled. The surrender of the fugitives in such cases to the State whose laws have been violated, is the only aid provided by the laws of the United States for the punishment of depredations and violence committed in one State by intruders and lawless bands from another State. The offenses committed by such parties are against the State; and the laws of the United States merely provide the means by which their presence can be secured in case they have fled from its justice. No mode is provided by which a person unlawfully abducted from one State to another can be restored to the State from which he was taken, if held upon any process of law for offenses against the State to which he has been carried. If not thus held he can, like any other person wrongfully deprived of his liberty, obtain his release on *habeas corpus*. Whether Congress might not provide for the compulsory restoration to the State of parties wrongfully abducted from its territory upon application of the parties, or of the State, and whether such provision would not greatly tend to the public peace along the borders of the several States, are not matters for present consideration. It is sufficient now that no means for such redress through the courts of the United States have as yet been provided. The abduction of Mahon by Phillips and his aids was made, as appears from the return of the respondent to the writ, and from the findings of the court below, without any warrant or authority from the Governor of West Virginia. It is true that Phillips was appointed by the Governor of Kentucky as agent of the State to receive Mahon upon his surrender on the requisition; but no surrender having been made, the arrest of Mahon and his abduction from the State were lawless and indefensible acts, for which Phillips and his aids may be justly

punished under the laws of West Virginia. The process emanating from the Governor of Kentucky furnished no ground for charging any complicity on the part of that State in the wrong done to the State of West Virginia." Again: "It is true, also, that the accused had the right while in West Virginia of insisting that he should not be surrendered to the Governor of Kentucky by the Governor of West Virginia, except in pursuance of the acts of Congress, and that he was entitled to release from any arrest in that State not made in accordance with them; but having subsequently been arrested in Kentucky under the writs issued on the indictments against him, the question is not as to the validity of the proceeding in West Virginia, but as to the legality of his detention in Kentucky. There is no comity between the States by which a person held upon an indictment for a criminal offense in one State can be turned over to the authorities of another, though abducted from the latter. If there were any such comity, its enforcement would not be a matter within the jurisdiction of the courts of the United States. By comity nothing more is meant than that courtesy on the part of one State, by which within her territory the laws of another State are recognized and enforced, or another State is assisted in the execution of her laws. From its nature the courts of the United States cannot compel its exercise when it is refused; it is admissible only upon the consent of the State, and when consistent with her own interests and policy. *Bank of Augusta* v. *Earle,* 13 Pet. 519, 589; Story's Conflict of Laws, § 30. The only question, therefore, presented for our determination is whether a person indicted for a felony in one State, forcibly abducted from another State and brought to the State where he was indicted by parties acting without warrant or authority of law, is entitled under the Constitution or laws of the United States to release from detention under the indictment by reason of such forcible and unlawful abduction."

After a review of the authorities, including the case of *Ker* v. *Illinois,* above cited, the court concluded: "So in this case,

it is contended that, because under the Constitution and laws of the United States a fugitive from justice from one State to another can be surrendered to the State where the crime was committed, upon proper proceedings taken, he has the right of asylum in the State to which he has fled, unless removed in conformity with such proceedings, and that this right can be enforced in the courts of the United States. But the plain answer to this contention is, that the laws of the United States do not recognize any such right of asylum, as is here claimed, on the part of a fugitive from justice in any State to which he has fled; nor have they, as already stated, made any provision for the return of parties who, by violence and without lawful authority, have been abducted from a State: There is, therefore, no authority in the courts of the United States to act upon any such alleged right. In *Ker* v. *Illinois*, the court said that the question of how far the forcible seizure of the defendant in another country, and his conveyance by violence, force, or fraud to this country, could be made available to resist trial in the state court for the offense charged upon him, was one which it did not feel called upon to decide, for in that transaction it did not see that the Constitution, or laws, or treaties of the United States guaranteed to him any protection. So in this case we say that, whatever effect may be given by the state court to the illegal mode in which the defendant was brought from another State, no right, secured under the Constitution or laws of the United States, was violated by his arrest in Kentucky, and imprisonment there, upon the indictments found against him for murder in that State."

These principles determine the present case and require an affirmance of the judgment of the Circuit Court. It is true the decision in the *Mahon* case was by a divided court, but its authority is none the less controlling. The principle upon which it rests has been several times recognized and reaffirmed by this court, and is no longer to be questioned. It was held in *Cook* v. *Hart*, 146 U. S. 183, 192, that the cases of *Ker* v. *Illinois* and *Mahon* v. *Justice* established these propositions:

"1. That this court will not interfere to relieve persons who have been arrested and taken by violence from the territory of one State to that of another, where they are held under process legally issued from the courts of the latter State. 2. That the question of the applicability of this doctrine to a particular case is as much within the province of a state court, as a question of common law or of the law of nations, as it is of the courts of the United States;" in *Lascelles* v. *Georgia,* 148 U. S. 537, 543, that it was settled in the *Ker* and *Mahon* cases that, "except in the case of a fugitive surrendered by a foreign government, there is nothing in the Constitution, treaties, or laws of the United States which exempts an offender, brought before the courts of a State for an offense against its laws, from trial and punishment, even though brought from another State by unlawful violence, or by abuse of legal process;" and in *Adams* v. *New York,* 192 U. S. 585, 596 (the same cases being referred to), that "if a person is brought within the jurisdiction of one State from another, or from a foreign country, by the unlawful use of force, which would render the officer liable to a civil action or in a criminal proceeding because of the forcible abduction, such fact would not prevent the trial of the person thus abducted in the State wherein he had committed an offense." See, also, *In re Johnson,* 167 U. S. 120, 127, in which the court recognized the principle that when a party in a civil suit has, by some trick or device, been brought within the jurisdiction of a court, he may have the process served upon him set aside, but that a different rule prevails in criminal cases involving the public interests.

To the above citations we may add *In re Moore,* 75 Fed. Rep. 821, in which it appeared or was alleged that one accused of crime against the laws of a State and in the custody of its authorities for trial, was brought back from another State as a fugitive from justice by means of an extradition warrant procured by false affidavits. In his application to the Circuit Court of the United States for a writ of *habeas corpus* the peti-

tioner stated facts and circumstances tending to show that he was not a fugitive from justice. The application was dismissed. After stating that the executive warrant issued by the surrendering State had performed its office and that the petitioner was not held in virtue of it, the court said: "His imprisonment is not illegal unless his extradition makes it so, and an illegal extradition is no greater violation of his rights of person than his forcible abduction. If a forcible abduction from another State and conveyance within the jurisdiction of the court holding him, is no objection to his detention and trial for the offense charged, as held in *Mahon* v. *Justice*, 127 U. S. 712, and in *Ker* v. *Illinois*, 119 U. S. 437, no more is the objection allowed if the abduction has been accomplished under the forms of law. The conclusion is the same in each case. The act complained of does not relate to the restraint from which the petitioner seeks to be relieved, but to the means by which he was brought within the jurisdiction of the court under whose process he is held. It is settled that a party is not excused from answering to the State whose laws he has violated because violence has been done him in bringing him within the State. Moreover, if any injury was done in this case in issuing the requisition upon the State of Washington without grounds therefor, the injury was not to the petitioner but to that State whose jurisdiction was imposed upon by what was done. The United States do not recognize any right of asylum in the State where a party charged with a crime committed in another State is found; nor have they made any provision for the return of parties who, by violence and without lawful authority, have been abducted from a State; and, whatever effect may be given by a state court to the illegal mode in which a defendant is brought from another State no right secured under the Constitution and laws of the United States is violated by his arrest and imprisonment for crimes committed in the State into which he is brought. *Mahon* v. *Justice*, 127 U. S. 715."

The principle announced in the *Mahon* and other cases above

cited was not a new one. It has been distinctly recognized in the courts of England and in many States of the Union. In *Ex parte Scott,* 9 B. & C. 446 (17 E. C. L. 204) (1829), one accused of crime against the laws of England, and who was in custody for trial, sought to be discharged upon *habeas corpus* because she had been improperly apprehended in a foreign country. Lord Tenterden, C. J., said: "The question, therefore, is this, whether if a person charged with a crime is found in this country it is the duty of the court to take care that such a party shall be amenable to justice or whether we are to consider the circumstances under which she was brought here. I' thought, and still continue to think, that we can not inquire into them. If the act complained of were done against the law of a foreign country, that country might have vindicated its own law. If it gave her a right of action, she may sue upon it." Some of the American cases, to the same general effect, are cited in *Mahon* v. *Justice,* namely, *State* v. *Smith,* 1 Bailey (S. C.), 283; *State* v. *Brewster,* 7 Vermont, 118; *State* v. *Ross,* 21 Iowa, 467. See also *Dow's case,* 18 Pa. St. 37; *State* v. *Kealy,* 89 Iowa, 94, 97; *Ex parte Barker,* 87 Alabama, 4, 8; *People* v. *Pratt,* 78 California, 345, 349; Church on Habeas Corpus, § 483, and authorities cited in notes, and note to *Fetter's case,* 57 Am. Dec. 389, 400.

It is said that the present case is distinguished from the *Mahon case* in the fact that the illegal abduction complained of in the latter was by persons who neither acted nor assumed to act under the authority of the State into the custody of whose authorities they delivered Mahon; whereas, in this case, it is alleged that Idaho secured the presence of Pettibone within its limits through a conspiracy on the part of its Governor and other officers. This difference in the cases is not, we think, of any consequence as to the principle involved; for, the question now is—and such was the fundamental question in *Mahon's case*—whether a Circuit Court of the United States when asked, upon *habeas corpus,* to discharge a person held in actual custody by a State for trial in one of its courts

under an indictment charging a crime against its laws, can properly take into account the methods whereby the State obtained such custody. That question was determined in the negative in the *Ker case* and *Mahon's case*. It was there adjudged that in such a case neither the Constitution nor laws of the United States entitled the person so held to be discharged from custody and allowed to depart from the State. If, as suggested, the application of these principles may be attended by mischievous consequences, involving the personal safety of individuals within the limits of the respective States, the remedy is with the lawmaking department of the Government. Congress has long been informed by judicial decisions as to the state of the law upon this general subject.

In this connection it may be well to say that we have not overlooked the allegation that the Governor and other officers of Idaho well knew at the time the requisition was made upon the Governor of Colorado, that Pettibone was not in Idaho on December 30, 1905, nor at any time near that date, and had the purpose in all they did to evade the constitutional and statutory provisions relating to fugitives from justice. To say nothing of the impropriety of any such facts being made the subject of judicial inquiry in a Federal court, the issue thus attempted to be presented was wholly immaterial. Even were it conceded, for the purposes of this case, that the Governor of Idaho wrongfully issued his requisition, and that the Governor of Colorado erred in honoring it and in issuing his warrant of arrest, the vital fact remains that Pettibone is held by Idaho in actual custody for trial under an indictment charging him with crime against its laws, and he seeks the aid of the Circuit Court to relieve him from custody, so that he may leave that State and thereby defeat the prosecution against him without a trial. In the present case it is not necessary to go behind the indictment and inquire as to how it happened that he came within reach of the process of the Idaho court in which the indictment is pending. And any investigation as to the motives which induced the action taken by

the Governors of Idaho and Colorado would, as already suggested, be improper as well as irrelevant to the real question to be now determined. It must be conclusively presumed that those officers proceeded throughout this affair with no evil purpose and with no other motive than to enforce the law.

We perceive no error in the action of the Circuit Court and its final order is

*Affirmed.*

Mr. Justice McKenna dissenting.

I am constrained to dissent from the opinion and judgment of the court. The principle announced, as I understand it, is that "a Circuit Court of the United States, when asked upon *habeas corpus* to discharge a person held in actual custody by a State for trial in one of its courts under an indictment charging a crime against its laws, cannot properly take into account the methods whereby the State obtained such custody." In other words, and to illuminate the principle by the light of the facts in this case (facts, I mean, as alleged, and which we must assume to be true for the purpose of our discussion), that the officers of one State may falsely represent that a person was personally present in the State and committed a crime there, and had fled from its justice, may arrest such person and take him from another State, the officers of the latter knowing of the false accusation and conniving in and aiding its purpose, thereby depriving him of an opportunity to appeal to the courts, and that such person cannot invoke the rights guaranteed to him by the Constitution and statutes of the United States in the State to which he is taken. And this, it is said, is supported by the cases of *Ker* v. *Illinois*, 119 U. S. 436, and *Mahon* v. *Justice*, 127 U. S. 700. These cases, extreme as they are, do not justify, in my judgment, the conclusion deduced from them. In neither case was the State the actor in the wrongs that brought within its confines the accused person. In the case at bar, the States, through their officers, are the

offenders. They, by an illegal exertion of power, deprived the accused of a constitutional right. The distinction is important to be observed. It finds expression in *Mahon* v. *Justice*. But it does not need emphasizing. Kidnapping is a crime, pure and simple.. It is difficult to accomplish; hazardous at every step. All of the officers of the law are supposed to be on guard against it. All of the officers of the law may be invoked against it. But how is it when the law becomes the kidnapper, when the officers of the law, using its forms and exerting its power, become abductors? This is not a distinction without a difference—another form of the crime of kidnapping, distinguished only from that committed by an individual by circumstances. If a State may say to one within her borders and upon whom her process is served, I will not inquire how you came here; I must execute my laws and remit you to proceedings against those who have wronged you, may she so plead against her own offenses? May she claim that by mere physical presence within her borders, an accused person is within her jurisdiction denuded of his constitutional rights, though he has been brought there by her violence? And constitutional rights the accused in this case certainly did have, and valuable ones. The foundation of extradition between the States is that the accused should be a fugitive from justice from the demanding State, and he may challenge the fact by *habeas corpus* immediately upon his arrest. If he refute the fact he cannot be removed. *Hyatt* v. *Corkran*, 188 U. S. 691. And the right to resist removal is not a right of asylum. To call it so in the State where the accused is is misleading. It is the right to be free from molestation. It is the right of personal liberty in its most complete sense. And this right was vindicated in *Hyatt* v. *Corkran*, and the fiction of a constructive presence in a State and a constructive flight from a constructive presence rejected. This decision illustrates at once the value of the right and the value of the means to enforce the right. It is to be hoped that our criminal jurisprudence will not need for its efficient administration the

destruction of either the right or the means to enforce it. The decision in the case at bar, as I view it, brings us perilously near both results. Is this exaggeration? What are the facts in the case at bar as alleged in the petition, and which it is conceded must be assumed to be true? The complaint, which was the foundation of the extradition proceedings, charged against the accused the crime of murder on the thirtieth of December, 1905, at Caldwell, in the county of Canyon, State of Idaho, by killing one Frank Steunenberg, by throwing an explosive bomb at and against his person. The accused avers in his petition that he had not been "in the State of Idaho, in any way, shape or form, for a period of more than ten years" prior to the acts of which he complained, and that the Governor of Idaho knew accused had not been in the State the day the murder was committed, "nor at any time near that day." A conspiracy is alleged between the Governor of the State of Idaho and his advisers, and that the Governor of the State of Colorado took part in the conspiracy, the purpose of which was "to avoid the Constitution of the United States and the act of Congress made in pursuance thereof, and to prevent the accused from asserting his constitutional right under cl. 2, sec. 2, of art. IV, of the Constitution of the United States and the act made pursuant thereof." The manner in which the alleged conspiracy had been executed was set out in detail. It was in effect that the agent of the State of Idaho arrived in Denver, Thursday, February 15, 1906, but it was agreed between him and the officers of Colorado that the arrest of the accused should not be made until some time in the night of Saturday, after business hours—after the courts had closed and judges and lawyers had departed to their homes; that the arrest should be kept a secret and the body of the accused should be clandestinely hurried out of the State of Colorado with all possible speed, without the knowledge of his friends or his counsel; that he was at the usual place of business during Thursday, Friday, and Saturday, but no attempt was made to arrest him until 11:30 o'clock P. M. Saturday,

when his house was surrounded and he arrested. Moyer was arrested under the same circumstances at 8:45, and he and accused "thrown into the county jail of the city and county of Denver." It is further alleged that, in pursuance of the conspiracy between the hours of five and six o'clock on Sunday morning, February 18, the officers of the State and "certain armed guards, being a part of the forces of the militia of the State of Colorado," provided a special train for the purpose of forcibly removing him from the State of Colorado, and between said hours he was forcibly placed on said train and removed with all possible speed to the State of Idaho; that prior to his removal and at all times after his incarceration in the jail at Denver he requested to be allowed to communicate with his friends and his counsel and his family, and the privilege was absolutely denied him. The train, it is alleged, made no stop at any considerable station, but proceeded at great and unusual speed; and that he was accompanied by and surrounded with armed guards, members of the state militia of Colorado, under the orders and directions of the adjutant general of the State.

I submit that the facts in this case are different in kind and transcend in consequences those in the cases of Ker v. Illinois and Mahon v. Justice, and differ from and transcend them as the power of a State transcends the power of an individual. No individual or individuals could have accomplished what the power of the two States accomplished; no individual or individuals could have commanded the means and success; could have made two arrests of prominent citizens by invading their homes; could have commanded the resources of jails, armed guards and special trains; could have successfully timed all acts to prevent inquiry and judicial interference.

The accused, as soon as he could have done so, submitted his rights to the consideration of the courts. He could not have done so in Colorado, he could not have done so on the way from Colorado. At the first instant that the State of Idaho relaxed its restraining power he invoked the aid of

*habeas corpus* successively of the Supreme Court of the State and of the Circuit Court of the United States. He should not have been dismissed from court, and the action of the Circuit Court in so doing should be reversed.

I also dissent in Nos. 250, 251, 265, 266 and 267. (See p. 222, *post.*)