## CHANDLER v. UNITED STATES.

### No. 4296.

United States Court of Appeals
First Circuit.

Dec. 3, 1948.

Writ of Certiorari Denied Feb. 28, 1949.
See 69 S.Ct. 640.

924

See also 72 F.Supp. 230.

Edward C. Park, of Boston, Mass. (Claude B. Cross and Philip F. Grogan, both of Boston, Mass., on the brief), for appellant.

Frederick Bernays Wiener, Sp. Asst. to Atty. Gen. (William T. McCarthy, U. S. Atty., of Boston, Mass., T. Vincent Quinn, Asst. Atty. Gen., Tom De Wolfe, Sp. Asst. to Atty. Gen., Gerald J. McCarthy, Asst. U. S. Atty., of Boston, Mass., and Bartholomew B. Coyne, Atty., Department of Justice, of Washington, D. C., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and GOODRICH (by special assignment) and WOODBURY, Circuit Judges.

MAGRUDER, Chief Judge.

Douglas Chandler is under sentence of life imprisonment and a fine of $10,000, upon conviction by a jury on an indictment charging the crime of treason against the United States. The charge was predicated upon defendant's radio broadcasting activities within the German Reich during World War II as an employee of the German Radio Broadcasting Company, an agency of the German Government under the jurisdiction of the Ministry of Public Enlightenment and Propaganda. The points raised on this appeal cover a wide range. We have been much aided by the industry and thoroughness of Government counsel and of court-appointed counsel for the defendant in their researches on the case, and by the distinguished ability with which they have marshaled their respective arguments. The case was tried with great care and patience by Judge Ford, and the

record contains memoranda by him covering his more important rulings. We sustain the conviction.

### FACTUAL SUMMARY.

The facts, as the jury were warranted in finding them, may be summarized as follows: Chandler was born in Chicago, Illinois, in 1889, and has always been a citizen of the United States. He married in this country and had two daughters born here. He tried his hand for a time at journalism and various other enterprises. In September, 1931, he and his family moved to Europe, where he remained until brought back to the United States in 1946. Prior to 1941 he lived from time to time in France, Austria, Germany, Yugoslavia, and Italy, and traveled extensively. From 1936 to the outbreak of war he executed various commissions for the preparation of illustrated articles for an American magazine.

Over the years Chandler had developed an anti-Jewish outlook, and his fierce emotions on that theme were accentuated by certain personal setbacks which he attributed to malignant Jewish interference. He came to believe, or to profess to believe, in the existence of a sinister world-wide Jewish conspiracy. Naturally he found the anti-Jewish climate of Nazi Germany congenial. While in Germany before the war his interest was cultivated by one Hoffman, an attache in the German Press Department, serving as contact man for foreign journalists. He was favorably impressed with what he saw in Germany and came to regard the Nazi regime as the bulwark of Western civilization against what he thought to be the Jewish-Bolshevist menace.

In 1940 he left Yugoslavia and came to Florence. There he conceived the idea of broadcasting his views to the United States, by way of warning against involvement in the European war. The American Consul in Florence, who at this time was urging Americans to return to the United States, did not authorize Chandler to travel to Germany on his American passport. However, Chandler was able to get to Berlin in February, 1941, on a German Fremdenpass (alien identity card) through the intervention of the German Consul, and his family followed in another month. He volunteered his services to the Propoganda Ministry, and arrangements were made for him to prepare commentaries and record them for broadcast to the United States, on a salaried basis. His broadcasts commenced in April, 1941. He adopted in his first broadcast, and retained throughout, the nom de plume "Paul Revere" [1] (though he revealed his true identity in subsequent broadcasts). The introductory theme song to his broadcasts was "Yankee Doodle" played on a flute accompanied by the sound of galloping horses' hoofs. After six months of this work he took a leave of absence.

Then came the Japanese attack upon Pearl Harbor. Though he recognized that "Germany through its pact with Japan was technically forced to issue its declaration of war", he regarded this change in the situation between Germany and the United States as only a technicality. Other Americans were repatriated from Berlin, but Chandler chose to stay.

In January, or February, of 1942, he made arrangements for the resumption of his activity as a broadcaster. He executed a contract with the "Reichs-Radio-Corp.-German Short Wave Station", which provided in Article I that "Mr. Douglas Chandler will be employed as a commentator in the U. S. A. newsroom. His employment is necessary by the war conditions; that means, on account of the drafting of permanent employees *and the additional war tasks of the radio,* respectively." [Italics added.] The stipulated compensation was 1000 Reichsmarks per month. Though the defendant was understood to be responsible only to the German Short Wave Agency, for bookkeeping reasons he at the same time entered into two other contracts, one with the "Foreign-Language-Service-Press-Corp.", at a salary of 750 Reichmarks per month, and another with the "Anti-Komintern" and the "Anti-Semitic Action" under which he was to receive 750 Reichsmarks a month, "for the regular collaboration in the foreign-language propaganda of the Anti-Komintern, and the

---

[1] In one of his broadcasts, in 1942, he referred to this nom de plume as his "nom de guerre".

Anti-Semitic Action, respectively." This aggregate compensation of 2500 marks per month made Chandler the highest paid commentator in the U. S. A. Zone of the Short Wave Station of the German Radio Broadcasting Company. His superior, the Chief of the U. S. A. Zone, received less than half this amount.

Defendant broadcast under these contracts two or three times a week uninterruptedly from February, 1942, to the end of July of that year. He then stopped for about two months following the death of his first wife, but he resumed on the same basis in October. After one of the routine conferences of the commentators, some time in February, 1943, he had a conversation with Wagner, the News Editor for the U. S. A. Zone. Wagner expressed his lack of interest in the anti-Semitic theme and his disbelief in the authenticity of the so-called "Protocols of the Elders of Zion". Chandler reported Wagner to the Gestapo as one whose loyalty to the Reich was suspect. Later, upon being taxed with this action by Wagner, Chandler said to Wagner: "You have been one of my best friends", but "the interests of the whole, of the Reich, are higher than my personal feelings." Chandler was suspended from the air in May, 1943, but at the solicitation of the Superintendent of the Short Wave Station he resumed his work in September, 1943. For some time after that he made his recordings in Vienna and the recordings were brought to the German Short Wave transmitter outside Berlin and there re-recorded on magnetic tape for broadcasting. There was a two-month interruption in the spring of 1944, due to Chandler's illness. In October, 1944, he moved to Durach, Bavaria, after which he made his recordings in Munich, and so continued until January or February of 1945, when he stopped for good. Thereafter he expressed a willingness to resume but he refused to come to Berlin to make his recordings as the Superintendent of the Short Wave Station desired him to do.

The objective of the enemy in the operation of its short-wave broadcasts clearly appears in the record, and is indeed a matter of common knowledge. Winkelnkemper, the Director General of the German-Reich-Radio-Corp., testified as follows:

"The German foreign broadcasts were made extensively use of as a means of psychological warfare, as it was done in every country, to support the German war effort by creating disunity in other peoples by undermining the morale, by splitting up the people in different parties, different social and radical parties, political parties, so that the land who is doing this psychological warfare may aim their war objects. And so it was done in Germany, too, and we made an extensive use of these propaganda as a means of psychological warfare."

The head of the Propaganda Ministry, Dr. Goebbels, under the direction of Hitler, laid down the principal themes to be harped upon in the German radio propaganda in furtherance of this psychological warfare. They were Bolshevism as No. 1 enemy to Christianity and private property; anti-Semitism—the support of Bolshevism by "international Jewry", with stress, so far as the United States was concerned, upon the supposed dominance of the Jews in government and finance, and in radio, films, and other agencies for influencing public opinion; the great achievements in the Reich in the field of social legislation as contrasted with the backwardness of the Anglo-Saxon countries; the invincible military and moral power of the Reich; and England's economic and political decline as a world power.

Goebbels held daily conferences with his top subordinates, at which he gave his instructions as to how to handle the news and as to what points he wanted currently stressed along the line of the basic propaganda themes just mentioned. These instructions were passed on down through a series of staff conferences. Chandler with other English-speaking broadcasters regularly attended the daily conferences held by the chief of the U. S. A. Zone, at which the standard propaganda directives as well as the daily directives were relayed and discussed, and instructions were given to the various commentators with reference to particular subjects. The commentators were not left in doubt as to the war mission of the Short Wave Agency. Wagner, the News Editor of the U. S. A. Zone, referring to these U. S. A. Zone conferences, testified:

"We said that German propaganda during the war was to be used chiefly to create disunity among the Allies, England, America, Russia, and also to create disunity within the individual countries. As far as the United States were concerned, in particular to build up racial controversies, to create unrest regarding the economic inequalities in the country, to work on minority problems and similar ideas, with the purpose of ultimately driving a wedge between the people and the Roosevelt Administration, and if possible to get a new election in which a government would be elected in the United States which would be against interference in European affairs, in other words, which would be isolationist in character."

Further, along the same line, he testified:

"The commentators were told to use the threat of inflation, of the collapse of the dollar after the war, as a means of propaganda, all to create unrest along that line. Similar ideas were brought up in connection with defeatist propaganda. Commentators were told to stress themes along the lines that America would never be able to win the war, that it would be much too costly, that the establishment of a Second Front would fail owing to the strength of German armies, that actually America had nothing to do in this European war, that America had no war aims, that the GI did not know what he was fighting for; and such ideas that were brought up, that we should attempt to create homesickness among the American troops and defeatism in general as to the losses which they might suffer and that these losses would be for nothing."

Appellant's manuscripts before recording and broadcasting were subject to military censorship, and to political censorship "to see to it that Mr. Chandler's commentaries would not run counter to the official German propaganda line, but that they would follow it in general outline." Twelve recordings of Chandler's Paul Revere broadcasts, made at various dates in 1942, were introduced into the evidence and played back to the jury. Woven through his talks were all the basic themes of the German propaganda line. The recordings made by him were beamed to the United States and frequently picked up at the monitoring station of the Federal Communications Commission in Silver Spring, Maryland. To what extent his broadcasts were heard by other persons in the United States does not appear, though in one of his broadcasts he said: "I am informed that there has been a vast increase in the number of Americans who habitually dial in on the shortwave sending of Berlin Radio."

APPELLANT'S APPREHENSION IN GERMANY AND RETURN TO THE UNITED STATES.

An earlier treason indictment had been returned against Chandler on July 26, 1943, in the United States District Court for the District of Columbia. In May, 1945, shortly after the close of hostilities in Europe, Chandler was taken into custody by the U. S. Army at his home in Durach, Bavaria, but he was returned to Durach, and apparently released from custody, on October 23, 1945. He was rearrested by the Army on or about March 12, 1946, at the request of the Department of Justice. On December 10, 1946, still in military custody, he was taken by plane to the United States, via Paris, the Azores, and Newfoundland. The intended destination was Washington, D. C., where the aforesaid treason indictment was outstanding against him. The plane crossed into the United States over the State of Maine. As a result of mechanical trouble with the plane's retractable landing gear, an unscheduled landing was made at Westover Field, Massachusetts, early in the morning of December 14, 1946. Chandler was there taken from the plane, and remained at Westover Field for about three hours, spending part of the time in the passengers' lounge. His guards then escorted him aboard another plane in which he was flown to Washington, D. C., where he landed on the same day at Bolling Field. He was there immediately turned over to U. S. deputy marshals who were waiting for him, and he was arraigned later in the day on the old indictment in the United States District Court for the District of Columbia. Shortly thereafter, on December 30, 1946, the present indictment was returned against Chandler in the United States District Court for the District of Massachusetts. On December 31, 1946, he was arrested in

Washington, D. C., and pursuant to a warrant for his removal issued by a judge of the United States District Court for the District of Columbia, he was taken by the marshal to Massachusetts and there delivered into the custody of the U. S. marshal for the District of Massachusetts, all in accordance with Rev.Stat. § 1014, 18 U.S. C.A. § 591.[2] Chandler was arraigned in Boston on January 20, 1947, and pleaded not guilty.

### INDICTMENT SUMMARIZED.

The indictment charged that the defendant, in various places within the German Reich, and at all times beginning on December 11, 1941, and continuing thereafter up to and including May 8, 1945, he then and there being a native-born citizen of the United States, and a person owing allegiance to the United States, in violation of said duty of allegiance, did knowingly, intentionally, and traitorously adhere to the enemies of the United States, and more particularly, to wit, the Government of the German Reich, and the German Radio Broadcasting Company and the officials and employees thereof, giving to the said enemies of the United States aid and comfort within the United States and elsewhere; that the aforesaid adherence of the defendant and the giving of aid and comfort by him to the aforesaid enemies of the United States "consisted of working as a radio speaker and commentator in the U. S. zone of the Short Wave Station of the German Radio Broadcasting Company, a company controlled by the German Government, which work included the preparation and composition of commentaries, speeches, talks and announcements, and the recording thereof for subsequent broadcast by radio from Germany to the United States"; that these activities of the defendant "were intended to persuade citizens and residents of the United States to decline to support the United States in the conduct of said war, and to weaken and destroy confidence in the administration of the Government of the United States." Paragraph 4 of the indictment enumerates 23 overt acts alleged to have given aid and comfort to the said enemies and which were know-

ingly and traitorously committed by the defendant with treasonable intent to adhere to and give aid and comfort to said enemies. Thirteen of these overt acts were withdrawn from consideration, some by the United States and others by the district judge, so that ten were submitted to the jury as possible acts of treason. Generally described, one of these overt acts was arranging for the making of a recording, two were speaking into a microphone in the actual recording of talks for broadcast, one was participation in a conference for improvement in the operation of the Short Wave Station, two were attendance and participation in conferences of radio commentators at which directives were received from higher authority relative to the content of broadcasts, four were participation in conferences aimed at securing the resumption or continuance of defendant's broadcasting activities.

The offense charged was similar to that on which "Lord Haw Haw" was convicted. Rex v. Joyce, 173 L.T. 377 (1945), aff'd sub nom. Joyce v. Director of Public Prosecutions, [1946] A.C. 347.

After arraignment, the court conducted a preliminary hearing to determine the mental capacity of the defendant to understand the nature of the proceedings against him and to aid rationally in the conduct of his defense, and found that he had such capacity. Various preliminary motions were made by defense counsel and disposed of by the court. The jury trial commenced on June 6, 1947, and lasted three weeks. The Government offered the testimony of some thirty witnesses and numerous exhibits. Chandler did not testify at the trial. The testimony of the seven witnesses called on his behalf was all directed to the defense of insanity, an issue that was fully tried, submitted to the jury under appropriate instructions, and resolved against the defendant by the verdict of the jury. On this appeal no error is alleged with respect to the disposition below of the issue as to defendant's sanity.

On June 28, 1948, the jury returned a verdict of guilty, finding specially that each and every one of the ten overt acts sub-

---

[2] 1948 Criminal Code, 18 U.S.C.A. § 3041.

mitted to it was "a treasonable act committed by the defendant Chandler with an intent to betray the United States".

We shall discuss first the points of law raised by the defendant in various preliminary motions submitted to the district judge.

### ACTS OF TREASON COMMITTED IN AN ENEMY COUNTRY ARE PUNISHABLE.

On a motion to dismiss, appellant advanced the point that the indictment failed to state facts sufficient to constitute an offense, because treason against the United States is not committed by adherence to the enemy by one residing in enemy territory. This contention is reiterated on appeal, notwithstanding the concession in appellant's brief "(1) that, since treason is a violation of allegiance, conduct may consistently with the law of nations be made an offense against the United States, though the acts be without its territorial jurisdiction, and (2) that the language of the constitutional definition may be broad enough to include such acts."

█ It is clear that under the constitutional definition of treason, Congress has power to punish treason committed abroad. In drafting the provision with reference to treason, the framers of the Constitution had much in mind the old English Treason Act of 25 Edw.III. See Hurst, Treason in the United States: II, 58 Harvard Law Review 395 et seq. (1945). Though the Constitutional Convention undoubtedly intended to restrict the definition of treason in certain particulars, the indications are compelling that there was no intention to put a territorial limitation upon the crime as defined. The Act of 25 Edw.III had included within the definition of treason the following (as translated from the Norman French in Rex v. Casement, L.R. [1917] 1 K.B. 98, 99n.) :

" * * * or if a man do levy war against our Lord the King in his realm, or be adherent to the King's enemies in his realm, giving to them aid and comfort in the realm, or elsewhere, and thereof be probably attainted of open deed by the people of their condition: * * * "

In Rex v. Casement, supra, it was held by the Court of Appeal that the Act of 25 Edw.III comprehended treason by a British subject committed in Germany during the first World War. Many of the authorities cited for this interpretation antedated the Constitutional Convention. See 8 Holdsworth, History of English Law, 307, 308.

Nevertheless, there was a verbal ambiguity in the English Act, which lent some plausibility to the argument that the adherence must be within the King's realm, though the aid and comfort might be given elsewhere. Jefferson noted this, in 1778, in his proposed revision of the Virginia Criminal Code, which contained a definition of treason expressly drawn to cover foreign treasons. See Hurst, Treason in the United States, 58 Harvard Law Review 252–53 (1944).

In the Constitutional Convention, the Committee of Detail reported a draft on August 6, 1787, in which treason was defined, without any territorial limitation, as consisting "only in levying war against the United States, or any of them; and in adhering to the enemies of the United States, or any of them." In Committee of the Whole, Morris and Randolph proposed a substitute, reading, "that if a man do levy war agst. the U. S. within their territories, or be adherent to the enemies of the U. S. within the said territories, giving them aid and comfort within their territories or elsewhere, and thereof be provably attainted of open deed by the People of his condition, he shall be adjudged guilty of Treason." This substitute was voted down. 2 Farrand, Records of the Federal Convention, 347–48. Article III, § 3, of the Constitution, as finally adopted, reads:

"Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

It was therefore not by inadvertence that the constitutional definition contains no territorial limitation either in the phrase

with respect to adherence or in the phrase with respect to the giving of aid and comfort. We agree with the conclusion of the district judge that the words "within their territories", "within the said territories", and "within their territories or elsewhere" contained in the substitute proposed by Morris and Randolph, "were omitted deliberately from the final draft, and with a purpose to encompass foreign treasons". 72 F.Supp. 234.

The first Congress proceeded promptly to exercise its power on the subject of treason. The Act of April 30, 1790, 1 Stat. 112, provided that, "if any person or persons, owing allegiance to the United States of America, shall levy war against them, or shall adhere to their enemies, giving them aid and comfort within the United States or elsewhere, * * * such person or persons shall be adjudged guilty of treason against the United States, * * *." This language, without substantial change, was carried forward into Rev.Stat. § 5331 and into § 1 of the Criminal Code, 35 Stat. 1088, 18 U.S.C.A. § 1 (1946 ed.) and is now found in 18 U.S.C.A. § 2381.

■■■ In view of the striking similarity between the constitutional definition of treason, and the almost contemporaneously enacted statutory definition, the same reasons which lead to the conclusion that the constitutional provision encompasses foreign treasons also indicate that the statutory language is to be read in similar comprehensive fashion. As in the Constitution, so in the statute, words of territorial limitation "within the United States" are omitted from the end of the phrase with reference to adhering to the enemy; and the statutory addition of the words "within the United States or elsewhere" at the end of the phrase with reference to the giving of aid and comfort is not an apt expression of intended territorial limitation but indicates, rather, quite the contrary. The express words of the statutory definition seem to us to overcome any possible presumption against the extraterritorial application of criminal statutes; and furthermore there seems to be no such presumption with reference to a crime of this character. States denounce the crime of treason as a matter of self-preservation.

It is not unlikely that a person meditating treason would take himself beyond the territorial limits of the United States in order to perpetrate the crime with greater security to himself. The nature of treason, therefore, is such that there is no a priori reason for supposing that the Congress would naturally be inclined to restrict the statutory definition of the crime to treason within the territorial limits of the United States. In this connection the language of Chief Justice Taft in United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149, is pertinent. In that case a provision of the Criminal Code punishing conspiracies to defraud the United States was construed as applicable to citizens of the United States upon the high seas or in a foreign country, though the Act contained no express language as to the locus of the offense. The Court said, 260 U.S. at pages 97, 98, 43 S.Ct. at page 41:

"We have in this case a question of statutory construction. The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds, which affect the peace and good order of the community, must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard. * * *

"But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents. Some such offenses can only be committed

within the territorial jurisdiction of the Government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense."

United States v. Bowman was cited with approval in Skiriotes v. Florida, 1941, 313 U.S. 69, 73, 74, 61 S.Ct. 924, 928, 85 L.Ed. 1193, for the proposition that "a criminal statute dealing with acts that are directly injurious to the government, and are capable of perpetration without regard to particular locality, is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect."

CONGRESS HAS BY LAW DIRECTED THE PLACE
OF TRIAL OF TREASONS COMMITTED
IN A FOREIGN COUNTRY.

Objection to the jurisdiction of the court below was made on the asserted ground that Congress has not by law directed the place of trial of crimes committed within the territorial jurisdiction of a foreign government.

■ Article III, § 2, cl. 3 of the Constitution provides that all criminal trials, except in cases of impeachment, "shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." [3] The first Congress exercised the power of directing by law the place of trial of crimes "not committed within any State". In § 8 of the Act of April 30, 1790, 1 Stat. 114, this language appeared:

"* * * and the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he may first be brought."

That provision in itself might have seemed to be clear enough and all-inclusive. But it was a clause tacked on to a section defining certain offenses committed "upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular State", for which offenses the offender was to be adjudged to be "a pirate and felon", and sentenced to death. It was undoubtedly this context of the venue clause above quoted which led Chief Justice Marshall to remark, in Ex parte Bollman, 1807, 4 Cranch 74, 135, 2 L.Ed. 554, that that provision "is understood to apply only to offences committed on the high seas, or in any river, haven, basin or bay, not within the jurisdiction of any particular state". In that case, Bollman, whose release on habeas corpus was sought, had been arrested in New Orleans by General Wilkinson and brought to Washington charged with treason. New Orleans was then within the Territory of Orleans, and there was in existence a district court of said territory, established by 2 Stat. 283, 285, with jurisdiction to try the offense. The Court held that Bollman could not be tried in the District of Columbia, because the venue clause of the Act of April 30, 1790, was meant to be applicable to those cases where "there is no court which has particular cognizance of the crime, and therefore, the place in which the criminal shall be apprehended, or, if he be apprehended where no court has exclusive jurisdiction, that to which he shall be first brought, is substituted for the place in which the offense was committed."

[3] The Sixth Amendment providing that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law", has no present relevance, for "that amendment has reference only to offences against the United States committed within a State". Cook v. United States, 1891, 138 U.S. 157, 181, 11 S.Ct. 268, 274, 34 L.Ed. 906.

The above venue provision of the Act of April 30, 1790, was lifted from its special context, and after some changes in phraseology was put by itself in a separate section of the Revised Statutes of 1874. Rev. Stat. § 730 provided:

"The trial of all offenses committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought."

This language was carried forward into § 41 of the Judicial Code, 36 Stat. 1100, and appeared as 28 U.S.C. § 102 (1946 ed.). It has recently been transferred to the Criminal Code, 18 U.S.C.A. § 3238, with a minor change not now pertinent.

 Whatever might have been the correct interpretation of the original venue clause of the Act of April 30, 1790, the subsequent version, as it has remained on the books without substantial change since Rev.Stat. § 730, ought, it seems to us, to be given its broad literal meaning. Congress having made treason by an American citizen a criminal offense wherever committed, whether within the territorial jurisdiction of the United States, or on the high seas or within a foreign country—as we have seen above—it would indeed be a glaring casus omissus if Congress had failed to designate the district in which an offender who committed his treasonable acts abroad should be tried. There is no such gap in the law. We cannot accept appellant's contention that in the phrase "all offenses committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district," the words "or elsewhere" should be construed with the preceding words "high seas", under the doctrine of ejusdem generis, "so as not to include places on land within the jurisdiction either of the United States or of foreign powers." Such suggested interpretation is contrary to the holdings in Jones v. United States, 1890, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691, and United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149. See Blackmer v. United States, 1932, 284 U.S. 421, 436, 52 S.Ct.

252, 76 L.Ed. 375. In the Jones case, a murder had been committed on one of the guano islands in the Caribbean Sea, a place over which the United States had asserted jurisdiction pursuant to the Act of August 18, 1856, 11 Stat. 119, Rev.Stat. §§ 5570–5578, 48 U.S.C.A. §§ 1411–1419. The offender was "first brought" into the District of Maryland. It was held that the United States District Court there had jurisdiction under Rev.Stat. § 730 to try the offender. 137 U.S. 211, 212, 11 S.Ct. 83, 34 L.Ed. 691. In United States v. Bowman, supra, the Court upheld the jurisdiction of the United States District Court for the Southern District of New York, under § 41 of the Judicial Code, to try an accused under an indictment charging conspiracy in Brazil to defraud the United States. The Court said, 260 U.S. at page 102, 43 S.Ct. at page 42, 67 L.Ed. 149: "The three defendants who were found in New York were citizens of the United States and were certainly subject to such laws as it might pass to protect itself and its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil to hold them for this crime against the government to which they owe allegiance." In view of these authorities, which we regard as controlling, it is unnecessary to discuss the other citations and arguments of appellant on this particular point.

### MASSACHUSETTS IS THE DISTRICT INTO WHICH THE DEFENDANT WAS "FIRST BROUGHT".

But appellant in various appropriate motions raised the further contention: That assuming § 41 of the Judicial Code to be applicable, the District of Massachusetts was not that into which the accused was "first brought". The circumstances under which Chandler was apprehended and brought back to the United States have been set forth earlier in this opinion. Appellant's argument is in the alternative, (1) that the word "brought" means "brought with intent to leave" or "brought and actually left" and does not include the case of one brought into the district for a brief pause in the course of transit through the district, and on this view Chandler was "first brought" into the District of Colum-

bia; or (2) if, however, the word "brought" includes the case of one brought into a district by plane solely for the purpose of transit through the district, it is immaterial whether the plane lands in the district or whether its flight in the air space over the district is uninterrupted, and on this view it would follow that Chandler was "first brought" into the District of Maine.

It would indeed be unfortunate if we were compelled to hold, on such a highly technical ground, that this elaborate trial has gone for naught.

The meanings of "found" (or "apprehended", as in the earlier versions), and of "first brought", have been before the courts in several cases. United States v. Thompson, C.C.D.Mass.1832, 28 Fed.Cas. 102, No. 16,492; United States v. Bird, D. C.D.Mass.1855, 24 Fed.Cas. 1148, No. 14,-597; United States v. Baker, C.C.S.D.N.Y. 1861, 24 Fed.Cas. 962, No. 14,501; United States v. Arwo, 1873, 19 Wall. 486, 22 L. Ed. 67; Kerr v. Shine, 9 Cir., 1905, 136 F. 61; United States v. Townsend, D.C.S.D. N.Y.1915, 219 F. 761; Pedersen v. United States, 2 Cir., 1921, 271 F. 187. In most of these cases the court was able to give an interpretation which would sustain the then pending criminal prosecution, as against the contention that the offense should have been prosecuted in some other district.

■ As above pointed out, the phrase "first brought" originated in the Act of April 30, 1790, long before the days of air travel. Congress could hardly have contemplated that flight across the air space of a particular district constituted bringing the accused into the district; therefore Maine was certainly not the proper district for this trial. In the analogous situation of transit through the territorial waters of a district, without landing, the cases say that such district is not the district into which the accused was "first brought". Pedersen v. United States, supra; United States v. Baker, supra. See United States v. Arwo, supra. The Government makes the reasonable contention, and we so hold, that the district into which the accused is first taken under custody and landed is the district into which the accused is "first brought" within the meaning of § 41 of the Judicial Code; and this was the district of Massachusetts in the case at bar. Such an interpretation is consistent with all the decided cases to which our attention has been directed. It is an interpretation which furnishes a rule of convenient application, turning on easily provable objective facts and not depending upon an inquiry into the intent of the persons who had the accused in custody.

JURISDICTION OF COURT BELOW AS AFFECTED BY CIRCUMSTANCES OF DEFENDANT'S APPREHENSION AND RETURN TO THIS COUNTRY.

■ By a motion for discharge from custody, which was denied, defendant urged that the court below had obtained jurisdiction of his person in violation of the laws of the United States, and ought not, therefore, to exercise such jurisdiction. As the objection is phrased, it seems to imply that a court may as a matter of discretion decline to exercise its jurisdiction in a criminal case, in like manner as a court of equity may sometimes decline to exercise its jurisdiction, as, for example, when to do so would be prejudicial to the public interest. See Burford v. Sun Oil Co., 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424. So far as we are aware, no such proposition has found its place in the criminal law; and the contrary seems to have been asserted in Stamphill v. Johnston, 9 Cir., 1943, 136 F.2d 291, 292, certiorari denied, 1943, 320 U.S. 766, 64 S.Ct. 70, 88 L.Ed. 457. But if the argument is to be taken to be an assertion of lack of lawful jurisdiction, still we think it is without merit.

As a preliminary matter it may be pointed out that there was no irregularity in the immediate proceedings by which Chandler was brought before the court below to answer the indictment pending against him. Chandler was arrested in Washington by the U.S. marshal for the District of Columbia under authority of a capias issued out of the District Court of the United States for the District of Massachusetts on December 30, 1946. He was brought to Boston pursuant to a warrant

for his removal issued in regular course under the authority of Rev.Stat. § 1014, 18 U.S.C. § 591 (1946 et.). Appellant's argument on this branch of the case makes the doubtful assumption, which we do not stop to examine, that these immediate proceedings, though otherwise lawful, may be found to be infected with illegality as a result of a more remote inquiry into the circumstances under which Chandler was brought to Washington, D.C., prior to his arrest under the present indictment. Cf. United States v. Unverzagt, D.C.W.D.Wash.1924, 299 F. 1015, affirmed 9 Cir., 1925, 5 F.2d 492, certiorari denied, 1925, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415.

The district court denied the motion for discharge from custody on the authority of Pettibone v. Nichols, 1906, 203 U.S. 192, 27 S.Ct. 111, 51 L.Ed. 148, 7 Ann.Cas. 1047; In re Johnson, 1897, 167 U.S. 120, 17 S.Ct. 735, 42 L.Ed. 103; Cook v. Hart, 1892, 146 U.S. 183, 13 S.Ct. 40, 36 L.Ed. 934; Mahon v. Justice, 1888, 127 U.S. 700, 8 S.Ct. 1204, 32 L.Ed. 283; Ker v. Illinois, 1886, 119 U. S. 436, 7 S.Ct. 225, 30 L.Ed. 421; McMahan v. Hunter, 10 Cir., 1945, 150 F.2d 498, certiorari denied, 1946, 326 U.S. 783, 66 S. Ct. 332, 90 L.Ed. 475; United States ex rel. Voight v. Toombs, 5 Cir., 1933, 67 F. 2d 744; Whitney v. Zerbst, 10 Cir., 1933, 62 F.2d 970; United States v. Unverzagt, D.C.W.D.Wash.1924, 299 F. 1015, affirmed 9 Cir., 1925, 5 F.2d 492, certiorari denied, 1925, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415; Ex parte Lamar, 2 Cir., 1921, 274 F. 160, affirmed 1923, 260 U.S. 711, 43 S.Ct. 251, 67 L.Ed. 476.

Appellant concedes that the foregoing cases establish the rule that a court "should not refuse to exercise jurisdiction over the person of a fugitive from justice merely because he has been brought within the territorial jurisdiction of the Court by illegal means"; but argues that that rule "covers only cases where an accused might lawfully have been brought within the jurisdiction for trial, though in fact brought there irregularly", and "does not comprehend a case where to bring the accused into the jurisdiction against his will is a violation of the law of the forum." We find no such distinction laid down or suggested in the cases cited. In re Johnson, 1897, 167 U.S. 120, at page 125, 17 S. Ct. 735, 42 L.Ed. 103, supra, the Court upheld the jurisdiction of the United States Court for the Southern District of the Indian Territory to try an accused under an indictment for rape, though it was assumed that the United States Commissioner for the Southern District of the Indian Territory exceeded his authority in issuing, and the marshal in executing within the Territory, a warrant of arrest—which must have been a violation of the law of the forum. Furthermore, there are cases upholding the power of a district court to try an accused who has been brought before it in violation of the procedure laid down by Congress for the removal from one federal district to another of a person charged with crime. Ex parte Lamar, 2 Cir., 1921, 274 F. 160, affirmed 1923, 260 U. S. 711, 43 S.Ct. 251, 67 L.Ed. 476; United States ex rel. Voight v. Toombs, 5 Cir., 1933, 67 F.2d 744; Sheehan v. Huff, 1944, 78 App.D.C. 391, 142 F.2d 81; Robinson v. United States, 6 Cir., 1944, 144 F.2d 392, 396. In all these cases the presence of the accused within the district would seem to have been obtained contrary to the law of the forum, for the Act of Congress prescribing the procedure for removal is the law of the land and the law within each district.

In addition to the foregoing, the argument fails anyway, because Chandler was not brought into the district of Massachusetts in violation of the law of the forum.

It is said that the manner in which the court below acquired jurisdiction of the defendant violated the law of the forum in three particulars, that is to say, (1) it violated the terms of the extradition treaty between the United States and Germany; (2) apart from treaty, it violated the right of asylum guaranteed by international law to political offenders; and (3) it violated the Act of June 18, 1878, 20 Stat. 152, 10 U.S.C.A. § 15, prohibiting the use of the Army of the United States as a posse comitatus.

The argument based upon the terms of the extradition treaty of July 12, 1930, between the United States and Germany, 47 Stat. 1862, assumes that the treaty was not abrogated or suspended by the outbreak of

war between the contracting parties. But see Karnuth v. United States ex rel. Albro, 1929, 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677; Techt v. Hughes, 1920, 229 N.Y. 222, 241, 128 N.E. 185, 11 A.L.R. 166, certiorari denied, 1920, 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454; 2 Hyde, International Law (2d Rev.Ed.1947) § 550. It also assumes that the treaty conferred a private right upon Chandler which he might assert in a court of the United States in bar of trial. But see Ker v. Illinois, 1886, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421.

■ Passing these difficulties with the argument, the treaty on its face has no application to the abnormal situation here presented. Article I contains a mutual undertaking of the parties to deliver up on requisition "any person, who may be charged with, or may have been convicted of, any of the crimes or offenses specified in Article III of the present Treaty committed within the territorial jurisdiction of one of the High Contracting Parties, and who shall be found within the territories of the other". This and other sections make it clear that the treaty applies only to fugitives who, unlike appellant, have fled the country where the crime was committed. Furthermore, treason is not one of the offenses enumerated in Article III; and Article IV specifically provides that the terms of the treaty "shall not import a claim of extradition for any crime or offense of a political character, nor for acts connected with such crimes or offenses." To establish that the treaty has been violated here, appellant would have to show from the language of the treaty that the United States thereunder assumed a contractual obligation as follows: that if a citizen of the United States should betake himself to Germany upon the eve of the outbreak of w a r b e-tween the United States and Germany, and if after war is declared between the two countries the American citizen should commit in Germany acts of treason against the United States, and if the armed forces of the United States and those of its Allies should invade and occupy Germany, supplant the defunct Government of the German Reich, and assume the powers of sovereignty, then, in such event, the United States contracts that it will not apprehend such traitor and bring him to trial for treason. Putting the proposition in this naked form, its absurdity is manifest. The United States made no such contract in the extradition treaty.

■ Nor was Chandler's arrest in Germany a violation of any "right of asylum" conferred by international law. In the absence of treaty a State may, without violating any recognized international obligation, decline to surrender to a demanding State a fugitive offender against the laws of the latter. United States v. Rauscher, 1886, 119 U.S. 407, 411, 412, 7 S.Ct. 234, 30 L.Ed. 425. Particularly as regards fugitive political offenders—including, presumably, persons charged with treason, Ex parte Commonwealth of Kentucky v. Dennison, 1868, 24 How. 66, 16 L.Ed. 717—it has long been the general practice of States to give asylum. But the right is that of the State voluntarily to offer asylum, not that of the fugitive to insist upon it. An asylum State might, for reasons of policy, surrender a fugitive political offender—for example, a State might choose to turn over to a wartime ally a traitor who had given aid and comfort to their common enemy—in such a case we think that the accused would have no immunity from prosecution in the courts of the demanding State, and we know of no authority indicating the contrary. Cf. Ker v. Illinois, 1886, 119 U.S. 436, 442, 7 S.Ct. 225, 30 L.Ed. 421; United States v. Insull, D.C.N.D.Ill.1934, 8 F.Supp. 310, 313. One can appreciate the considerations which ordinarily would make a State reluctant to give affirmative assistance to a sister State in the apprehension and prosecution of a fugitive charged with a political offense. But these considerations are inapplicable to the wronged State, which naturally would have no qualm or scruple against bringing a fugitive traitor to trial if it could lay hands on him without breaking faith with the asylum State. The qualification on the proposition just stated is illustrated in United States v. Rauscher, 1886, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425, where the Court held that, under the terms of the extradition treaty between the United States and England, as implement-

ed by Rev.Stat. § 5275 [now 18 U.S.C.A. § 3192], a person who had been extradited to this country for trial upon a particular offense could not thereafter be arrested and brought to trial for a different offense until he had a reasonable opportunity to return to the country of asylum. See comment on the Rauscher case in Lascelles v. Georgia, 1893, 148 U.S. 537, 542, 543, 545, 13 S.Ct. 687, 37 L.Ed. 549. See also Innes v. Tobin, 1916, 240 U.S. 127, 132, 133, 36 S. Ct. 290, 60 L.Ed. 562. In the case at bar, however, the situation does not remotely resemble that in the Rauscher case, for here Chandler was not taken into custody and returned to the United States pursuant to the extradition treaty between the United States and Germany. His arrest by our occupying forces was wholly outside the treaty, and not in violation of any international undertaking either expressed or implied in the treaty.

 We need refer only briefly to the argument based upon alleged violation of a provision of the Act of June 18, 1878, 20 Stat. 152, which, in its present form, reads as follows, 10 U.S.C.A. § 15:

"It shall not be lawful to employ any part of the Army of the United States, as a posse comitatus, or otherwise, for the purpose of executing the laws, except in such cases and under such circumstances as such employment of said force may be expressly authorized by the Constitution or by act of Congress; and any person willfully violating the provisions of this section shall be deemed guilty of a misdemeanor and on conviction thereof shall be punished by fine not exceeding $10,000 or imprisonment not exceeding two years or by both such fine and imprisonment. Provided, This section shall not be construed to apply to the District of Alaska."

The foregoing was originally a section inserted into an Army Appropriation Act as a backwash of the Reconstruction period following the Civil War. Its legislative history, as set forth in Lieber, The Use of the Army in Aid of the Civil Power,[4] indicates that the immediate objective of the legislation was to put an end to the use of federal troops to police state elections in the ex-Confederate states where the civil power had been reestablished. In contrast to the criminal statute denouncing the crime of treason, this is the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent. See the quotation from United States v. Bowman, supra. Particularly, it would be unwarranted to assume that such a statute was intended to be applicable to occupied enemy territory, where the military power is in control and Congress has not set up a civil regime. Cf. Ex parte Milligan, 1866, 4 Wall. 2, 141, 142, 18 L.Ed. 281; MacLeod v. United States, 1913, 229 U.S. 416, 33 S.Ct. 955, 57 L.Ed. 1260; Hirabayashi v. United States, 1943, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774. The turning up of this obscure and all-but-forgotten statute is a credit to the industry of counsel; but we know perfectly well that if the members of the Armed Forces who took Chandler into custody were prosecuted for a criminal offense under 10 U.S.C. A. § 15, such prosecution would surely fail.

Counsel for appellant have not suggested any alternative procedure which in their view properly could have been employed to bring Chandler to trial; in fact, all their arguments involve the conclusion, which we deem unacceptable, that there was no way in which a court of the United States could obtain lawful jurisdiction over Chandler unless he should choose to relinquish his asylum in Germany and voluntarily return to the United States.

### The Indictment Was Not Bad for Duplicity.

 The district court committed no error in denying a motion to dismiss the indictment on the ground that its single count was duplicitous. See Ford v. United States, 1927, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793; Crain v. United States, 1896, 162 U.S. 625, 636, 16 S.Ct. 952, 40 L. Ed. 1097; Jacobsen v. United States, 7 Cir., 1921, 272 F. 399, 401, certiorari denied, 1921, 256 U.S. 703, 41 S.Ct. 625, 65 L.

---

4 War Department, Document No. 64, Office of the Judge-Advocate General, Government Printing Office, 1898.

Ed. 1179. An indictment in similar form was upheld in Stephan v. United States, 6 Cir., 1943, 133 F.2d 87, certiorari denied, 1943, 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148. No doubt it is possible to commit several distinct offenses of treason, by unrelated acts of giving aid and comfort to the enemy, each with the requisite treasonable intent. But the present indictment, as the Government points out, "charges a single treasonable enterprise, namely, adehering to the enemies of the United States by working as a radio speaker and commentator for the German Radio Broadcasting Company, and the ten overt acts submitted to the jury were simply ten separate acts of appellant in furtherance of his treason which show that he gave aid and comfort to the enemy." Acquittal or conviction under the present indictment would, we think, clearly be a bar to a prosecution of Chandler on another indictment setting forth the same treasonable enterprise and varied merely by the allegation of a different overt act in connection with Chandler's employment by the German Radio Broadcasting Company. Furthermore, even if the various alleged overt acts should technically each have been set forth in a separate count, we fail to perceive how appellant's "substantial rights" could have been prejudicially affected where, as here, the overt acts were all included in a single count, but the jury were required to make separate special findings as to each overt act. Rule 52(a), Federal Rules of Criminal Procedure, 18 U.S.C.A. Appellant suggests that the form of the indictment tended to convey to the jury the erroneous notion that the crime of treason consists of a state of mind manifested by acts; and that if the Government had been required to state each overt act in a separate count, it would have been clear to the jury that treason consists of overt acts of giving aid and comfort to the enemy with a specific intent to betray. The suggestion of confusion on this score seems to us fanciful, for the trial judge gave extended and explicit instructions to the jury as to the function of the overt act in a treason prosecution, quoting from the opinion in Cramer v. United States, 1945, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441.

THE MERITS.

The points remaining for discussion go to the heart of the case, involving as they do the nature and elements of the crime of treason under our constitutional and statutory definition, the sufficiency of the overt acts alleged and proved, and an inquiry into what constitutes the specific "intent to betray" which is an ingredient of the offense. In our consideration of these matters, we have had borne in upon us the truth of an observation by the Supreme Court in Cramer v. United States, 325 US.. at pages 46, 47, 65 S.Ct. at page 940, 89 L.Ed. 1441: "The framers' effort to compress into two sentences the law of one of the most intricate of crimes gives a superficial appearance of clarity and simplicity which proves illusory when it is put to practical application. There are few subjects on which the temptation to utter abstract interpretative generalizations is greater or on which they are more to be distrusted. The little clause is packed with controversy and difficulty. The offense is one of subtlety, and it is easy to demonstrate lack of logic in almost any interpretation by hypothetical cases, to which real treasons rarely will conform." We shall, therefore, try to say enough to decide the case before us, without being too much disturbed by our doubts as to the proper answer to some of the hypothetical cases advanced in argument.

### (a) Sufficiency of the Overt Acts.

Appellant's basic objection to the sufficiency of the overt acts in the case at bar is that mere words, the expression of opinions and ideas for the purpose of influencing people, cannot constitute an overt act of treason; that appellant had a right to broadcast, or otherwise disseminate to the American people, the ideas which coincided with the Nazi propaganda line; and that therefore his preliminary steps to that end—his attendance at conferences of commentators, his preparation of commentaries, his speaking into a microphone to make recordings—cannot be treasonable acts.

There are occasional statements to be found in the books to the effect that mere words cannot amount to an overt act of

treason. Thus, Mr. Justice Nelson, in a Charge To The Grand Jury reported in 30 Fed.Cas. page 1034, at 1035, No. 18,271 (C.C.S.D.N.Y.1861), said: "Words oral, written or printed, however treasonable, seditious or criminal of themselves, do not constitute an overt act of treason, within the definition of the crime." In Wimmer v. United States, 6 Cir., 1920, 264 F. 11, 12, 13, the court said: "It is well settled that one cannot, by mere words, be guilty of treason." See also United States v. Werner, D.C.E.D.Pa.1918, 247 F. 708. That is true in the sense that the mere utterance of disloyal sentiments is not treason; aid and comfort must be given to the enemy. But the communication of an idea, whether by speech or writing, is as much an act as is throwing a brick, though different muscles are used to achieve different effects. One may commit treason by conveying military intelligence to the enemy, though the only overt act is the speaking of words. Other cases may readily be imagined where the speaking of words might constitute treason. Thus, suppose an enemy agent in this country, whose assigned mission was to defeat the consummation of a scientific research project of vital importance to the war effort, bribed and seduced a distinguished American scientist, a consultant in the project, to give an opinion that the work was proceeding on the wrong lines and to suggest procedures which he knew would lead the project down a blind alley: We take it that the scientist in such a case could be convicted of treason, for deliberately giving aid to the enemy agent in steps essential to the consummation of his hostile mission, though the only overt acts were expressing purported scientific opinions. The significant thing is not so much the character of the act which in fact gives aid and comfort to the enemy, but whether the act is done with an intent to betray. In Cramer v. United States, supra, 325 U.S. at page 29, 65 S.Ct. at page 932, 89 L.Ed. 1441, the Court said:

"On the other hand, a citizen may take actions which do aid and comfort the enemy—*making a speech critical of the government or opposing its measures,* profiteering, striking in defense plants or essen-tial work, and the hundred other things which impair our cohesion and diminish our strength—but if there is no adherence to the enemy in this, if there is no intent to betray, there is no treason." [Italics added.]

We have not overlooked a possible constitutional limitation upon treason prosecutions for the making of critical speeches. "We do not lose our right to condemn either measures or men because the country is at war." Frohwerk v. United States, 1919, 249 U.S. 204, 208, 39 S.Ct. 249, 251, 63 L. Ed. 561. Chandler owed allegiance to the political entity the United States, not to the person of the President nor to the party in power for the time being. The framers of the Constitution, in drafting the restrictive language of the treason clause, apparently had in mind to eliminate the historic misuse of treason prosecutions as an oppressive instrument of domestic political faction, as indicated in the study on "Treason in the United States" by Willard Hurst in 58 Harv.L.Rev. 395, 412 (1945):

"What is suggested is that the historic policy restrictive of the scope of 'treason' under the Constitution was most consciously based on the fear of extension of the offense to penalize types of conduct familiar in the normal processes of the struggle for domestic political or economic power. The sale of provisions to an enemy in wartime, or the conveying of intelligence to him, or the proffer of counsel and assistance to his agents, are types of conduct quite distinct from activities of a sort to which political opponents or economic groups would normally resort in their efforts to influence public policy. There is less danger that charges of this type could, in view of the sharply defined character of the conduct in question, be used to suppress free competition for the power to direct the policies of the republic."

Thus, a citizen, in the exercise of his ordinary political rights may—intemperately as he pleases—criticize the President for getting the country into war, hold up to ridicule the bungling and incompetence with which our civilian and military leaders are conducting the war, express the view that we cannot possibly win the war,

and that the thing to do is to vote in a new administration which will negotiate a peace on the best terms obtainable and save the country from a greater disaster. The speech may tend to weaken our country in its war effort by inducing divided counsels and a spirit of defeatism, and in that sense may be of aid and comfort to the enemy. Such, indeed, might be the speaker's purpose. But if it be assumed that the utterance in the case supposed would not be treason, whatever the speaker's purpose, the immunity would be afforded, not to encourage treasonable efforts to aid in the enemy's triumph, but in order that, in the course of the normal activities of political opposition, the expression of honest criticism and sincere conviction as to what is best for the country may not be fettered by fear of a jury's finding of traitorous purpose in the passion and tumult of a subsequent prosecution for treason. Assuming that the utterances in the case supposed would not be treason, they might still be punished as sedition, subject to the requirement of the First Amendment that the utterances must be in such circumstances and of such a nature "as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." Schenck v. United States, 1919, · 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470.

In the present case, however, it cannot be said that what Chandler did was merely exercising his right of free speech in the normal processes of domestic political opposition. He trafficked with the enemy and as their paid agent collaborated in the execution of a program of psychological warfare designed by the enemy to weaken the power of the United States to wage war successfully. We have found no indication of a reluctance on the part of the framers of the Constitution to punish as treason any breach of allegiance involving actual dealings with the enemy, provided the case is established by the required two-witness proof.

It is preposterous to talk about freedom of speech in this connection; the case cannot be blown up into a great issue of civil liberties.

What we already have said is perhaps sufficient to indicate the answer to a related argument by appellant, that "If words can be acts of treason, they must at least meet the test of 'clear and present danger' established in the sedition cases" as a deduction from the First Amendment. Trafficking with the enemy, in whatever form, is wholly outside the shelter of the. First Amendment. Congress may make criminal any type of dealing with the enemy which in its judgment may have the potentiality of harm to our national interests, including acting as a commentator on the enemy's short wave station. Conviction could be had under such a criminal statute whether or not the prohibited acts, in the particular case, actually created any clear and present danger of substantial harm to the United States.

The concluding portion of the treason clause provides: "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." As observed in the Cramer case, 325 U.S. at pages 47, 48, 65 S.Ct. at page 941, 89 L.Ed. 1441: "It is not difficult to find grounds upon which to quarrel with this constitutional provision. Perhaps the framers placed rather more reliance on direct testimony than modern researches in psychology warrant. Or it may be considered that such a quantitative measure of proof, such a mechanical calibration of evidence is a crude device at best or that its protection of innocence is too fortuitous to warrant so unselective an obstacle to conviction." However that may be, the salutary purpose of this evidentiary obstacle was to minimize the danger of convicting the innocent. The nature of the crime is such that prosecutions for treason were thought likely to be conducted in a virulent atmosphere, with the triers of the facts all too prone to infer the commission of an overt act from circumstantial evidence. Not only was direct testimony required, but direct testimony of two witnesses, and they had to be "two Witnesses to the same overt Act". The two-witness rule must be applied in the light of its underlying policy.

Sometimes the overt act charged may be a single isolated act, such as dis-

closure of battle plans to an enemy agent. In such case the overt act must be proved by the direct testimony of two witnesses who heard the conversation between the accused and the enemy agent. Sometimes, as in the case at bar, the treason may consist of a course of conduct in a single treasonable enterprise. In Haupt v. United States, 1947, 330 U.S. 631, 640, 67 S.Ct. 874, 878, 91 L.Ed. 1145, the Court said:

"And while two witnesses must testify to the same act, it is not required that their testimony be identical. *Most overt acts are not single, separable acts, but are combinations of acts or courses of conduct made up of several elements.* It is not easy to set by metes and bounds the permissible latitude between the testimony of the two required witnesses." [Italics added.]

May such treasonable "course of conduct" be established by the direct testimony of two or more witnesses, though no two witnesses could testify to the same atomized element of the course of conduct?

We have no doubt that treason may be predicated upon collaboration as an enemy agent in the execution of a program of psychological warfare beamed to the United States over the enemy's short wave radio. That being so, the case against Chandler has been established by the most satisfactory and overwhelming proof. There is no possibility that he has been convicted of something he did not do. The contracts of employment which he executed are in evidence. Not two, but half a dozen or more witnesses testified of their personal knowledge to his continuous day-by-day participation in the work of the short wave station—attendance at conferences to receive directives as to the current propaganda line, the preparation of manuscripts for his regular Paul Revere broadcasts, and the submission of them subsequently for censorship, collaboration occasionally with other employees of the short wave station in the preparation of special programs to be broadcast jointly, the making of recordings for subsequent broadcasts, etc. The authenticity of the twelve sample Paul Revere recordings introduced into evidence was established by competent testimony, and is not challenged by the defendant. In a statement prepared and signed by Chandler after he was brought back to this country, which statement was received in evidence without objection, he tells the story of his employment as a commentator on the short wave station, though of course he protests that in all he did he was actuated by patriotic motives.

It has been assumed by the Government that the two-witness rule required the prosecution to break down the continuous course of conduct into its separate episodic elements and to produce two witnesses to the same element—for instance, two witnesses who could testify that they saw and heard Chandler make a recording on a particular identified occasion. For the reasons suggested above, and bearing in mind the underlying policy sought to be served by the two-witness rule, we are not sure that the requirement was as exacting as the Government has supposed. Two-witness proof that Chandler made a recording on an identified occasion does not render any more convincing the already indubitable case in support of the generalized charge in the indictment that "the aforesaid adherence of said defendant, Douglas Chandler, and the giving of aid and comfort by him to the aforesaid enemies of the United States during the period aforesaid consisted of working as a radio speaker and commentator in the U.S.A. Zone of the short wave station of the German Radio Broadcasting Company, a company controlled by the German Government, which work included the preparation and composition of commentaries, speeches, talks and announcements, and the recording thereof for subsequent broadcast by radio from Germany to the United States". Two-witness proof of the fragmented elements of Chandler's course of conduct only adds a burden to the prosecution in the nature of an empty technicality.

But we shall assume, without deciding, that that burden did rest upon the prosecution. It then becomes necessary to examine the ten overt acts submitted to the jury, in the light of the statement in the Cramer case, 325 U.S. at page 34, 65 S.Ct. at page 934, 89 L.Ed. 1441, that "The very minimum function that an overt act must perform in a treason prosecution is that it

shows sufficient action by the accused, in its setting, to sustain a finding that the accused actually gave aid and comfort to the enemy."

 Possibly the overt acts, viewed in rigid isolation and apart from their setting, would not indicate that they afforded aid and comfort to the enemy. But viewed in their setting, which is set forth above under the heading Factual Summary, they certainly take on incriminating significance. They then appear as typical routine activities of Chandler in fulfillment of the purpose of his continuous employment as radio commentator for the German Propaganda Ministry over a period of three years. The enemy's mission which Chandler participated in forwarding—the objective of the German Short Wave radio program beamed to the United States—also appears as part of the setting. It was an obvious advantage to the enemy in the execution of that program to have the open assistance of a cultivated and widely traveled American citizen like Chandler.[5] That the enemy deemed Chandler's services to be of aid and comfort is attested by the high salary which they paid him. These services consisted not merely of the culminating act of making a recording, but also of the necessary preliminary acts directed to that end. They were all part and parcel of the totality of aid and comfort given by the course of conduct as a whole. Attending a conference of commentators, at the summons of the Chief of the U.S.A. Zone, in order that directives as to the current propaganda line might be relayed and discussed and individual assignments made, could reasonably be found to have been of aid and comfort to the enemy. The proof under overt acts 4 and 5 established Chandler's participation in two such conferences. And certainly the making of recordings by Chandler, on the occasions proved under overt acts 17 and 18, warranted findings that Chandler gave aid and comfort to the enemy. The evidence under overt act 17 showed two recordings by Chandler on the same occasion: one a recording for his regular Paul Revere broadcasts, and another a recording of a special mixed program of poetry and music. The evidence under overt act 18 showed the making of a dialogue recording by Chandler and one Sittler, who was employed as a translator in the U.S.A. Zone.

 It is immaterial that the enemy mission as a whole, which defendant assisted, did not achieve its purpose. In Haupt v. United States, supra, one of the overt acts relied on was accompanying a known enemy saboteur to the house of the superintendent of an optical company for the purpose of assisting the saboteur to obtain employment as a step in the fulfillment of his hostile mission. See 7 Cir., 152 F.2d 771, at pages 774, 775. It did not appear that the saboteur actually obtained the desired employment. He was apprehended a short time thereafter and his whole mission frustrated. Yet the overt act was deemed sufficient. The act "aided an enemy of the United States toward accomplishing his mission of sabotage. The mission was frustrated but defendant did his best to make it succeed." 330 U.S. at page 644, 67 S.Ct. at page 880, 91 L.Ed. 1145. So, in the present case, it makes no difference how many persons in the United States heard or heeded Chandler's broadcasts. It does not even matter whether the particular recordings proved under overt acts 17 and 18 were actually broadcast. Chandler's service was complete with the making of the recordings, which thus became available to the enemy to use as it saw fit. It was no part of Chandler's job to put the recordings on the air. His act of making the recording for the enemy is like giving to an enemy agent a paper containing military information, which would be a completed act of aid and comfort, though the enemy agent later lost the paper and thus never put the information to any effective use.

 Appellant points out that the witnesses who testified to the making of the Paul Revere recording referred to in overt act 17 were unable to recall the content of

---

[5] Compare the remark of the Lord Chancellor in Joyce v. Director of Public Prosecutions, [1946] A.C. 347, 371, that "the special value to the enemy of appellant's services as a broadcaster was that he should be represented as speaking as a British subject."

that particular recording. This is not surprising, since it was a routine performance which Chandler repeated two or three times a week during the whole period of his employment. But does the two-witness rule require the witnesses to negative the hypothesis, which might be conceived of by a highly imaginative person, that on that particular occasion Chandler called on the American people to redouble their efforts to rescue the freedom-loving peoples of Europe from Hitler's monstrous tyranny? That would indeed be making a joke of the whole business. As stated in Haupt v. United States, 330 U.S. at page 640, 67 S.Ct. at page 878, 91 L.Ed. 1145, "it is not required that testimony be so minute as to exclude every fantastic hypothesis than can be suggested." The overt act of making the Paul Revere recording was attested to by two witnesses; its incriminating character was illumined by the other evidence in the case, by the setting in which the act was done.[6] It was thus perceived to be a participating act by Chandler meshed in with the psychological warfare being conducted by the German Short Wave Station.

Nor would it be of consequence if, in the particular recording testified to under overt act 17, Chandler confined his talk to cultural topics or to the reading of poetry. The radio programs devised by his superiors contained balanced elements of news, commentary, music and entertainment. This was necessary, as Chandler well appreciated, "in order to gain listener interest," and to render the listeners more receptive to insinuation of the propagandist ideas.[7] Though Chandler was hired by the enemy as a "commentator", he was also fitted into the other parts of the program as seemed useful to his superiors from time to time.

It is not necessary to refer in detail to the evidence on the other overt acts submitted to the jury. Since the jury returned special findings as to each of the overt acts, to the effect that it was "a treasonable act committed by the defendant Chandler with an intent to betray the United States", it is enough if any one of the overt acts, in its setting, warranted a finding that the accused actually gave aid and comfort to the enemy. See Haupt v. United States, 1947, 330 U.S. 631, 641 n. 1, 67 S.Ct. 874, 91 L.Ed. 1145.

#### (b) Intent to Betray.

Finally, we come to appellant's argument relating to the "intent to betray". This phrase does not appear in the constitutional or statutory definition of the crime, but is deduced from the concept of adherence to the enemy. Adherence to the enemy and an overt act giving aid and comfort to the enemy must both be present to make a treason under our law. Harboring disloyal sentiments is not enough. The mere expression of disloyal sentiments is not enough. There must be an overt act giving aid and comfort. Of course one may give aid and comfort to the enemy without an intent to betray, as where a citizen inno-

---

[6] In the Haupt case, the two witnesses testified to an overt act which to them was entirely innocent, namely, that the defendant accompanied his son to the house of a prospective employer to further the son's application for employment. This act was shown to be a treasonable one by the other evidence in the case, indicating that the son, to the knowledge of the father, was an enemy agent bent on a mission of sabotage.

[7] The witness Wagner testified that in the latter part of 1942 he discussed with Chandler a program which Wagner was devising for a series of broadcasts to be directed to the American troops in North Africa. He later embodied the proposed program in a memorandum, which he showed to Chandler. Chandler stated that he would be interested in partici-pating in the program by reading poetry. The memorandum stated that the main purpose of the program is "naturally not the entertainment of the opposing troops but *to influence them through propaganda*", by arousing doubt, home-sickness, fear for the future, and a belief that the United States is fighting on the wrong side. The memorandum stated that the program must be arranged so that it "does not 'stink' of propaganda to such an extent that it automatically arouses an antagonism"; that among other things it should contain plenty of good popular music, sentimental songs and "from time to time, good standard American poetry (Whitman, Tennyson, even Kipling) selected on the basis to arouse homesickness and the desire for peace".

cently assists an enemy agent not knowing or suspecting him to be such.

Appellant's main point on this branch of the case is that the district judge made an erroneous distinction between "intent" and "motive" in his charge to the jury, as follows:

"In the law of treason, like the law of lesser crimes, every person is assumed to intend the natural consequences that he himself knows will result from his acts. And, in this case, if you find the defendant Chandler committed a voluntary act or acts which actually gave aid and comfort to the enemy and at that time and in his circumstances he knew, or with his knowledge had reason to know that the natural consequence of his act would be that aid and comfort would result to the enemy in the conduct of its war against the United States, you would be warranted in finding from the commission of the acts themselves that he intended to give aid and comfort to Germany, that he intended to adhere to the enemy, that he intended to strike at his own country and betray it and the fact that his motive might not have been to aid the enemy is no defense. In other words a person cannot do an act which he knows will give aid and comfort to the enemy and then attempt to disclaim criminal intent and knowledge by saying that one's motive was not to aid the enemy.

"In the case on trial, if you find that this defendant voluntarily performed an act or acts which he knew would give aid and comfort to a country or its citizens or agents known to him to be enemies of the United States and that he intended by so doing to assist the enemy or injure the United States and betray his own country, he cannot avoid the consequences of his act by asserting that his motive was not to aid the enemy but was a desire to save the United States and the world from a Jewish or Bolshevist menace, or to obey a call, or to change the personnel of our government, or a desire for financial gain. Motive cannot negative an intent to betray, if you find the defendant had such an intent. Where a person has an intent to bring about a result which the law seeks to prevent, his motive is immaterial."

We think the above charge stated the law with sufficient accuracy.

The argument is made that treason is a crime dependent upon the actor's motives; that the jury should have been told that the defendant could not be found to have had an "intent to betray" if they believed that he acted from patriotic motives upon the sincere conviction that what he did was for the best interests of the United States. Appellant is surely wrong in that contention.

In the first place, consider the subtle task which would be imposed upon the jury by an inquiry of that kind. Appellant had become, as stated in his brief, "fanatically anti-Semitic". What part did this factor play in his motivation? Man has a propensity for self-deceptive rationalization to justify to himself conduct which, deep down, proceeds from motives he would be reluctant to acknowledge. Did Chandler carefully inquire into the supposed facts upon which his intense views and opinions were based? In weighing the evidence, did he make a conscious effort to discount the distorting influence of his prejudices, before arriving at his conclusions? Whether Chandler was "sincere" in what he did, whether he had the heart of a patriot, is a matter that may be sifted out at the last Great Judgment Seat; but the law of treason is concerned with matters more immediate.

Furthermore, if appellant's argument in this connection were sound, it would of course be applicable whatever might be the character of the overt acts of aid and comfort to the enemy. Suppose Chandler had obtained advance information of the Anglo-American plans for the invasion of North Africa and had passed the information on to the enemy. Would a treason prosecution fail if he could convince the jury that, in his fanatical and perhaps misguided way, he sincerely believed his country was on the wrong side of the war; that he sincerely believed his country's ultimate good would be served by an early withdrawal from the war; that he sincerely believed that the best, perhaps the only, way to accomplish this good end was to bring it about that the first major military

operation of the United States should be a resounding fiasco, thereby stimulating such a revulsion among the American people that the perfidious administration would be forced to negotiate a peace? It is hardly necessary to state the answer to that question.

When war breaks out, a citizen's obligation of allegiance puts definite limits upon his freedom to act on his private judgment. If he traffics with enemy agents, knowing them to be such, and being aware of their hostile mission intentionally gives them aid in steps essential to the execution of that mission, he has adhered to the enemies of his country, giving them aid and comfort, within our definition of treason. He is guilty of treason, whatever his motive. As stated in Cramer v. United States, 325 U.S. at page 32, 65 S. Ct. at page 933, 89 L.Ed. 1441: "It may be doubted whether it would be what the founders intended, or whether it would well serve any of the ends they cherished, to hold the treason offense available to punish only those who make their treacherous intentions more evident than may be done by rendering aid and comfort to an enemy."

The twelve sample recordings of Chandler's Paul Revere broadcasts, to which we have made earlier reference, were introduced into evidence and played back to the jury on the issue whether Chandler had an intention to betray, and not in proof of the overt acts which were subject to the two-witness rule. The judge charged the jury "that these recordings that were played back in court can only be considered on the question of intent and not on the issue of aid and comfort. They cannot supply any deficiency with respect to two-witness proof on any of the overt acts submitted as possible acts of treason in the event you find such a deficiency." Appellant asserts that it was prejudicial error to admit these recordings (though in connection with overt act 17 he complains that the content of that particular recording was not proven). In Cramer v. United States, 325 U.S. at page 31, 65 S.Ct. at page 933, 89 L.Ed. 1441, the Court said:

"What is designed in the mind of an accused never is susceptible of proof by direct testimony. If we were to hold that the disloyal and treacherous intention must be proved by the direct testimony of two witnesses, it would be to hold that it is never provable. It seems obvious that adherence to the enemy, in the sense of a disloyal state of mind, cannot be, and is not required to be, proved by deposition of two witnesses."

On the issue of intent, the prosecution was entitled to have the jury consider all the evidence admissible under the ordinary sanctions of verity having a rational bearing on what was in Chandler's mind— which necessarily is a matter of inference. This includes what he did, and also what he said. The evidence was clearly admissible for the purpose stated. Haupt v. United States, supra, 330 U.S. at page 642, 67 S.Ct. at page 879, 91 L.Ed. 1145. We cannot say that the district court committed an abuse of discretion in admitting the evidence.

On the evidence in its entirety, the jury could properly find that Chandler had an intent to betray the United States. It certainly appears that he wanted Germany to win the war, though it may be wondered just how this might be accomplished without the United States losing it. To one witness he remarked that "an American victory in Europe would endanger Western civilization in Europe, whereas a German victory in Europe would in no way harm the United States, it wouldn't touch the United States." To another witness he stated "that he thought it his mission to drift the United States out of the war." Of course Chandler knew that he was dealing with enemy agents. He knew the hostile mission of the German Short Wave Station, and voluntarily hired himself to the enemy with the purpose of contributing to the execution of that hostile mission. And he did so contribute.

The trial judge correctly charged the jury as follows:

"The defendant Chandler, while domiciled in the German Reich, owed a qualified allegiance to it; he was obligated to obey its laws and he was equally amenable to punishment with citizens of that country if he did not do so. At the same time the

defendant Chandler while residing in Germany during the period stated in the indictment, owed to his government full, complete, and true allegiance."

The present case involves no problem of acts of aid and comfort performed under enemy duress. Chandler was not under enemy compulsion; upon the contrary it was he who sought employment with the Short Wave Station. Nor does the present case necessitate any detailed examination as to how far an American citizen, caught in an enemy country at the outbreak of war, may, in order to earn a living and without the stigma of treason, accept employment which in these days of total war might conceivably be of some aid in the enemy war effort. Here, as elsewhere in the law, there may be troublesome questions of degree. It is enough to say that in our opinion the present case falls clearly on the treasonable side of the line.

Our conclusion on the whole case is that appellant had a full and fair trial in a court of competent jurisdiction, with every safeguard to which he was by law entitled; that the verdict of guilty was well warranted by the evidence; and that there was no error in the proceedings.

The judgment is affirmed..